

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NOS. PD-0292-08 & PD-0295-08

---

### MARK DE LA PAZ, Appellant

### v.

### THE STATE OF TEXAS

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

---

COCHRAN, J., delivered the opinion of the Court, in which MEYERS, PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, and HOLCOMB, JJ., joined. KELLER, P.J., not participating.

### OPINION

Appellant, a former Dallas Police Department Narcotics detective, was convicted of (1) tampering with physical evidence for knowingly making false statements in a police report, and (2) aggravated perjury for making the same false statements under oath. The court of appeals reversed the convictions, holding that the trial court's admission of

extraneous–offense evidence violated Rule of Evidence 404(b) and was harmful.[1]   We granted review to address the application of Rule 404(b) in this context.[2]   We find that the extraneous offenses were admissible to prove a fact of consequence–appellant's knowledge that his statements were false when he made them.

## I.

### A.     The State's Case:  The Arrest of Jose Vega

The events that led to appellant's conviction arose out of the wrongful arrest of Jose Vega.  Roberto Gonzalez, who had already been convicted for his part in Vega's wrongful arrest, testified that he and appellant's confidential informant, Daniel Alonso, manufactured fake drugs[3] and then planted them in a Cadillac parked at the garage where Jose Vega worked.  The next day, he and Alonso met appellant and another officer at a 7-11 to arrange a "buy-bust" deal.  Appellant did not search either of them or their car.  Gonzalez and Alonso then drove to the garage.  Appellant, and his partner, Eddie Herrera, followed in appellant's red Chevy truck to do "moving surveillance."

---

[1] *Delapaz v. State*, No. 05-06-00963-CR & No. 05-06-00964-CR, 2007 Tex. App. LEXIS 9928 (Tex. App.— Dallas Dec. 20, 2007) (not designated for publication). The court of appeals spells appellant's name "Delapaz," the reporter's record and the parties spell it "De La Paz." Following the reporter's record, we will also spell it "De La Paz."

[2] We granted the State's petition asking:  "When a police officer charged with perjury and falsifying police reports testified at his trial and admits making the alleged perjured statements but denied their falsity and knowledge of their falsity, does the trial court act within its discretion in admitting nearly identical extraneous acts of perjury to prove the officer, in fact, knew the statements to be false?"

[3] They manufactured twenty-two, one-kilo packages of pool chalk.

According to Gonzalez, Alonso got out of the car alone and walked into the garage bay where Vega was working under a van. Shortly thereafter, Alonso walked out of the bay, over to the garage restroom, and then back to the car. A surveillance videotape, set up across from the garage, also captured the events: Alonso got out of his car, walked into the bay, and then turned left out of sight for about twenty seconds. He then walked out and around to an outside bathroom. Alonso then came back to his car and, with Gonzalez in the passenger seat, drove off. The tape also showed appellant and his partner driving by twice.

Back at the 7-11, Alonso delivered two of the fake kilos to appellant. Appellant paid Alonso for his work, and Alonso in turn paid Gonzalez $300. Appellant called in a report that Alonso had just purchased two kilos of cocaine from Vega and that there was more in the Cadillac parked outside the garage. This report was called in to "a direct entry clerk" to obtain a warrant. Uniformed officers appeared and arrested Vega, and then, in a search pursuant to the warrant, police found the rest of the "cocaine" in the Cadillac.

In both a supplemental police report[4] and under oath at a previous trial,[5] appellant testified that, as he and his partner drove by the garage, he observed Alonso come into contact with Vega inside the garage bay. No one else witnessed that contact. Vega testified

---

[4]The report, made only hours after Vega's arrest, states, "Delapaz and Herrera were also conducting surveillance at the location and observed the C.I. come into contact with AP Vega."

[5]Appellant's former testimony was read into the record: "I saw the informant pull up to the location, walk to the bay of the garage. I passed Ledbetter and his camera view. I have a better angle to see inside the garage, and I happened to see both of them together. Right in the corner of the garage, I see both of them together. By that time, I'm making the loop around and I lost sight of them." Appellant added that the two men were "face-to-face."

that he was working under a van the entire time; he never even knew Alonso was in the garage. Gonzalez testified that Vega was under a van the entire time. Herrera testified that, although he saw Alonso walk into the bay, he lost sight of him as they drove away. The video operator, Detective Ledbetter, testified he did not see (nor did the video show) Alonso come into contact with anyone. He said he could not see into the bay from his camera angle: "There's just no angle that you could get there that you could see straight into that bay."

Herrera testified that, after Vega's arrest came under scrutiny, appellant asked him to lie to Public Integrity and to stick to the story in the police report–that they actually saw the contact between Alonso and Vega inside the bay. After he was shown the surveillance video, Herrera knew "that there was no way they were going to believe that." Nevertheless, out of loyalty to his partner and friend, Herrera perjured himself when he testified before the grand jury. By the time of trial, he was cooperating with the State and hoping that his felony charges would be dismissed. On cross-examination, defense counsel intimated that Herrera was also cooperating because he wanted his old police job back.

**B.     Appellant's Defense**

Appellant's defense was that his statements were true because he saw the contact between Alonso and Vega. Therefore, he had no intent to deceive, as is required for aggravated perjury, and he made no false police report, as is required for tampering with physical evidence.

Appellant put on evidence of an out-of-court experiment: photographs taken from the

street into the garage bay to show that it was possible for him to have seen Vega and Alonso

making contact.  These photographs were taken by a defense investigator, and they show the

investigator's father standing approximately three feet inside the garage bay.  Appellant

testified that he saw Alonso and Vega making contact as they stood about three or four feet

inside the garage bay.

Q.     Tell the jury–when you started looking back, tell the jury what you're seeing going on.
A.     As I'm driving, I'm making sure there's not a car coming towards me.  And then as I'm getting up there, I turn back around for a brief second, and then that's when I see Daniel Alonso walk right inside the bay of the garage.
Q.     Okay.  And how far did you see him go inside the garage?
A.     It was–he just made the turn and came in maybe about three or four feet.  It was maybe real close in there.  He wasn't all the way to the back.  He was right there at the front of the bay.
Q.     Okay.  And when you saw him at that location, did you see anything else?
A.     Yes, I did.  I saw a Hispanic male wearing a blue work shirt and he looked–dark hair and a mustache.  That's all I saw.
Q.     Okay.  And how long did you have this vision of Daniel Alonso and this other person?
A.     I just had it for a brief–a brief moment.  As soon as I saw him come in contact, then I went back around.

Appellant said that he wrote the statement about Alonso and Vega coming into contact in his

report for his "recollection when I go to testify in court."  He said that his purpose was to tell

the truth, and that he "was not trying to influence anything."  He also denied telling Herrera

to "stick with" his story.

On cross-examination appellant said that, although it turned out that Alonso had set

Vega up with fake "cocaine," he  did not make a false statement in the police report or testify

falsely because he did see Alonso come into contact with Vega in the garage bay.  Appellant

said that the photos his investigator took of his father standing in the bay "show that you could see someone inside there." Appellant accused Vega and Herrera of lying.

**C.     The State's Proffer of Extraneous Offenses and the Trial Court's Ruling and Limiting Instruction**.

After the defense rested, the State proffered evidence of two of appellant's other "buy-bust" deals. In each, appellant's police report stated that he witnessed either the exchange of drugs or the contact between the confidential informant and the suspect. The State contended that these police reports were false and that, in each instance, appellant did not see what he said he saw. The State argued that the extraneous offenses, which occurred very close in time to the charged offense, were admissible to rebut "the defensive theory that our witnesses lied in the Vega case." Appellant objected that the extraneous offenses were not admissible to rebut appellant's general denial of the offense, or to rebut any defensive theory that the State's witnesses were lying, because it was the State that elicited appellant's testimony that Vega and Herrera were liars. Thus, evidence of the two other "buy-bust" deals was inadmissible under Rules 404(b) and 403.

The State responded that "the prosecutor didn't elicit the evidence. The Defense put on their theory that Mr. Delapaz is telling the truth and everybody else is lying. He raised that on his direct examination. All Mr. Shook did was further explore that." The trial court found "that the proffered evidence could tend to rebut a defensive theory. The probative value outweighs any prejudicial effect, and it will be admitted."

**D.     Evidence of the Extraneous "Buy-Bust" Deals.**

Evidence of the extraneous offenses was then offered by six witnesses. First, a police officer testified about appellant's statements in two different police reports: In the first case, "AO Delapaz observed AP Amador place the cooler into the informant's vehicle"; and in the second, "Arresting Officers Delapaz and Herrera were conducting surveillance at the location and observed Arrestee Hernandez come in contact with the confidential informant." After that testimony, the court orally instructed the jury:

> The evidence the State is now offering is being admitted for the limited purpose to rebut a defensive theory that the State's witnesses lied. You cannot consider this evidence unless you first find and believe beyond a reasonable doubt that the defendant committed such other offenses if any were committed.

## 1.    Roberto Amador

Roberto Amador testified that he was wrongfully arrested on June 6, 2001, when he went to talk to someone who had called him about buying his wrecker, which was in a transmission shop bay getting fixed. The caller– who was appellant's confidential informant (C.I.) Jose Ruiz–arrived, walked around the wrecker, and then went outside and made a phone call. As he was talking on the phone, police arrived and made everyone in the shop stand up against the wall. They arrested Amador and let everyone else go. Amador testified that he never made a drug deal with Ruiz; he never walked near Ruiz' Explorer; and he never took an ice cooler out of his truck and put it into Ruiz's Explorer.

Jose Ruiz, the C.I., testified that his plan was to pretend that he was going to purchase Amador's wrecker, but, in fact, to set him up with fake drugs. He and others, including Alonso, made the fake drugs on the morning of the arrest. They pressed pool chalk into

squares and wrapped the squares into plastic. He put the fake drugs in a cooler in his Explorer and then drove the Explorer to the shop to meet Amador. He talked to him for about five minutes, and then he called the police to come and arrest Amador. He said that Amador never touched the cooler, which was always in Ruiz's Explorer. He said that appellant did not check his Explorer before the "buy-bust" deal.

**2.      Jorge Hernandez**

Jorge Hernandez testified that, on September 24, 2001, his truck would not start. He walked to a nearby garage, looking for a mechanic. The mechanic wasn't there, but his helper was, and the helper lent Hernandez his car. When Hernandez returned the borrowed car to the garage, he noticed that the police were there, and they "had all the mechanics out on the street with their hands on the wall searching them." At the same time, a couple of men walked up to the garage carrying food and cokes, but the police prevented them from going in. Hernandez nevertheless walked over to return the car keys. A police officer came running towards him: "He took the keys. He took my wallet. He took my cigarettes. He checked them, and he put them back and then he handcuffed me." Hernandez said was taken to jail, and he later learned he was being charged with selling drugs. Hernandez said that he never negotiated a drug deal at the garage.

Regarding the Hernandez arrest, Ruiz testified that he and Alonso made some fake crystal methamphetamine to set up a specific person–not Hernandez–at the garage. They planted the fake drugs in the garage when no one was there. They didn't see the man they

meant to set up, but they did see Hernandez walking towards the garage, and they decided to "pick on that man." Neither of them had ever talked to Hernandez. They called appellant because they "were ready and the drugs were in place and the person we were going to plant the drugs on was there." When appellant did not get there right away, Ruiz and Alonso went to the Dairy Queen to get tacos, then they returned to the garage with their Dairy Queen bags. By then, the police were there, and they chased Ruiz and Alonso away. They went back to their car, called appellant again, and told him to arrest Hernandez.

The jury convicted appellant and sentenced him to five years' imprisonment.

## E.     The Appeal and Motion for Rehearing

Appellant appealed and challenged, *inter alia*, the trial court's admission of the extraneous offenses. The court of appeals correctly framed the issue as "whether evidence of appellant's extraneous misconduct was relevant to a 'fact of consequence' other than its tendency to prove character conformity."[6] First, it held that the misconduct was not relevant to rebut appellant's claim that Herrera was lying, because appellant did not accuse Herrera of lying until he was cross-examined by the State and specifically asked by the prosecutor whether Herrera was making up his story. *Id.* And, as a general rule, the State cannot itself elicit the alleged defensive issue it then wishes to rebut with extraneous offense evidence.[7] Second, it held that appellant's attack on Herrera (or any other State's witness) was not a

---

[6] *Delapaz*, 2007 Tex. App. LEXIS 9928, at *8.

[7] *Id.* (citing *Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002)).

"defensive issue" that opened the door to extraneous offense evidence, because "allowing extraneous offenses to rebut a challenge to the credibility of the State's witnesses 'would totally eviscerate rule 404(b) and the policies underlying the prohibition against the admission of such evidence.'"[8]

The State filed a motion for rehearing arguing that: 1) the State did not elicit appellant's claim that Herrera was lying by "prompting or maneuvering"; instead, defense counsel asked appellant on direct examination if he had asked Herrera to lie–as Herrera had testified he had–and appellant said that he had not; 2) the evidence was admissible to prove intent; and 3) the evidence was admissible under the Doctrine of Chances. The court of appeals denied rehearing, and the State petitioned for discretionary review, presenting these same arguments.

## II.

### A.     Admissibility of Other Crimes, Wrongs or Acts.

Under the Texas Rules of Evidence, evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith." But it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[9] The exceptions listed under Rule 404(b) are neither mutually exclusive nor

---

[8] *Id.* at *9 (quoting *Webb v. State*, 36 S.W.3d 164, 180-81 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)).

[9] TEX. R. EVID. 404(b).

collectively exhaustive.[10] "Rule 404(b) is a rule of inclusion rather than exclusion."[11]  The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character.[12]  The proponent of uncharged misconduct evidence need not "stuff" a given set of facts into one of the laundry-list exceptions set out in Rule 404(b), but he must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than "bad character" or propensity purpose.

One well-established rationale for admitting evidence of uncharged misconduct is to rebut a defensive issue that negates one of the elements of the offense.[13]  That is, a "party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to

---

[10] *Pondexter v. State*, 942 S.W.2d 577, 583-84 (Tex. Crim. App. 1996); *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (op. on reh'g); *Banda v. State*, 768 S.W.2d 294, 296 (Tex. Crim. App. 1989) (catalogue of "other purposes" is not exhaustive, and "[w]hether or not it fits neatly into one of these categories, an extraneous transaction will be admissible so long as it logically tends to make the existence of some fact of consequence more or less probable.").

[11] *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000).

[12] *See Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996) ("if evidence (1) is introduced for a purpose other than character conformity, (2) has relevance to a 'fact of consequence' in the case and (3) remains free of any other constitutional or statutory prohibitions, it is admissible").

[13] *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005); *Montgomery*, 810 S.W.2d at 387.

an elemental fact, or defensive evidence that undermines an elemental fact."[14]  But a mere denial of commission of an offense generally does not open the door to extraneous offenses because, as appellant properly points out,  "a defendant generally denies commission of the offense at trial–that is the reason for having a trial."[15]

**B.    The Standard of Review**

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court."[16]  So, too, is a ruling on the balance between probative value and the counter factors set out in Rule 403, although that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence.[17] Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard.[18]  As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be

---

[14] *Martin*, 173 S.W.3d at 466.

[15] Brief for Appellant at 1.

[16] *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

[17] *See Montgomery*, 810 S.W.2d at 388 (presumption under Rule 403 is that probative value outweighs prejudicial effect "unless in the posture of the particular case the trial court determines otherwise"); *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001) ("Rule 403 requires exclusion of evidence only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value"); *Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992).

[18] *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005); *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).

upheld.[19] A trial court's ruling is generally within this zone if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.[20] Furthermore, if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial judge gave the wrong reason for his right ruling.[21]

### III.

#### A.      Perjury and Tampering with Evidence

A person commits perjury if, with intent to deceive and with knowledge of the statement's meaning, he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath.[22] A person commits aggravated perjury if he commits perjury as defined in Section 37.02, and the false statement: (1) is made during or in connection with an official

---

[19] *Montgomery*, 810 S.W.2d at 391.

[20] *See Santellan*, 939 S.W.2d at 169.

[21] *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982 ) ("when a trial court's ruling on the admission of evidence is correct, although giving a wrong or insufficient reason, this Court will not reverse if the evidence is admissible for any reason"); *see also Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002); *Shugart v. State*, 32 S.W.3d 355, 362 (Tex. App.—Waco 2000, pet. ref'd) ("It is well established that when a trial court's ruling on the admission of evidence is correct for any reason, although a wrong or insufficient reason is given for its admissibility, the ruling must be sustained on appeal.").

[22] TEX. PENAL CODE § 37.02.

proceeding; and (2) is material.[23]  A jury must find not only that the statement in question is false, but that the speaker believed it was false.[24]  If the jury concludes that a defendant honestly, though mistakenly, thought that his statement was true when he made it, then the jury could not find that he "intended to deceive."[25]

A person commits tampering with physical evidence if, knowing that an investigation or official proceeding is pending or in progress, he makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding.[26]  Thus, knowledge that the statement is false is an element of both crimes–indirectly in aggravated perjury, and directly in tampering with physical evidence.

**B.      Admission to Rebut Appellant's Defensive Theory that the State's Star Witness Fabricated His Version of the "Buy-Bust" Drug Deal.**

As we recently noted in *Bass v. State*,[27] a defense opening statement may open the

---

[23] TEX. PENAL CODE § 37.03.

[24] *Thorn v. State*, 961 S.W.2d 12, 18 (Tex.—Dallas 1996, pet. ref'd).

[25] *See Covalt v. State*, 877 S.W.2d 445, 449 (Tex. App.—Houston [1st Dist.] 1994, no pet.);  *Thorn*, 961 S.W.2d at 18 ("if a jury believes that a perjury defendant thought his statement was *true,* they would be unable to find that he 'intended to deceive,' and acquittal would be required"); *see also Hardy v. State*, 246 S.W.3d 290, 295-96 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) ("A person who willfully swears falsely to a belief in the existence of a fact which he knows does not exist is as guilty of perjury as if he had sworn directly to the existence of a fact which he knew did not exist.") (internal quotations omitted).

[26] TEX. PENAL CODE § 37.09.

[27] 270 S.W.3d 557 (Tex. Crim. App. 2008).

door to the admission of extraneous-offense evidence to rebut defensive theories presented in that opening statement.[28]  Bass was a pastor accused of sexually assaulting a teenager on church property.  In his opening statement, he claimed the teenager's allegations were "pure fantasy" and "pure fabrication."  He, "as a pastor and minister," was "the real deal and the genuine article."[29]  After the teenager testified, the trial court permitted the State to present the extraneous-offense evidence during its case-in-chief, which showed that appellant had sexually assaulted two other girls in his church office.

We held that it was "at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory that the complainant fabricated her allegations against him and of rebutting the defensive theory clearly suggesting that appellant, as a 'real deal' and 'genuine' pastor, would not engage in the type of conduct alleged in the indictment."[30]

In this case, appellant likewise attacked one of the State's star witnesses in opening argument:

> When you look at all this and, specifically, Mr. Herrera's testimony, we'll show you he has an incentive, that he had an incentive to go to the prosecutors and say, hey, I'll tell you whatever you want to hear.  And his incentive is he's trying to keep himself out of prison because we'll show you when he testified the first time in the grand jury he was given immunity.

---

[28] *Id.* at 563.

[29] *Id.* at 558.

[30] *Id.* at 563.

Appellant did not have to wait his turn to show that Mr. Herrera had a motive to cooperate with the State: Herrera testified on direct examination for the State that he had been granted immunity, and that he was cooperating with the State, in part, because he was expecting some sort of offer–ranging from probation to dismissal–for his own pending criminal charges. On cross-examination, defense counsel asked Herrera about his prior lies to the grand jury and suggested that Herrera was cooperating now only because he wanted to "get rid of" his pending felony cases and get his police job back. Appellant also implied, during his cross-examination of Vega, that Vega also had a strong motive to lie: He was paid $480,000 by the City of Dallas in a civil suit stemming from his wrongful arrest and imprisonment. Appellant also expressed incredulousness that Vega never noticed Alonso walk into the garage. The defense's basic attack was that both Herrera and Vega were lying or fabricating their present testimony concerning the drug deal for ulterior motives.

But it was not until the State cross-examined appellant that he expressly accused these witnesses of being liars. First he attacked Vega.

Q.     You're telling this jury that you saw Daniel Alonso face to face with Jose Vega?
A.     Yes, I am.
Q.     So one of you has to be lying.
A.     Yes, sir.

Then Herrera.

Q.     And–well, you've heard Eddie Herrera tell his story. It's different from you, isn't that right?
A.     Yes, sir.
Q.     You're denying that y'all talked about coming up with a different version or getting your story straight on what could have been seen?

A.     That did not happen.

Q.     None of that happened?

A.     No, sir.

Q.     He's making that up?

A.     He's making that up, and he's lying.

The parties argued, at trial and on appeal, about whether the defensive theory that Herrera (and Vega) were lying was raised by appellant or was elicited by "prompting or maneuvering" by the State.   The court of appeals decided it was the latter,[31] but that court did not have the benefit of our decision in *Bass*, which was decided six months after the court of appeals's decision in this case.  The State now relies on *Bass* ("*Bass* is directly on point," because appellant raised a fabrication defense in opening statement), and appellant distinguishes it ("*Bass* is not analogous," because appellant raised a general defense that he saw the contact).

There is an element of truth in both characterizations.  Appellant's defense was that he could see contact between Alonso and Vega because he had a better angle.  And his attack on Herrera–in opening, on cross-examination, and in his own testimony on direct–was not as strong, direct, or sustained as Bass's was on his teenage complainant.  But appellant did, in his opening statement, suggest that Herrera would say whatever the State wanted to hear, and he did, in his own direct testimony, inferentially accuse Herrera of lying because he denied telling Herrera to "stick with" his story.

Thus, appellant's position was that the contact did occur, and he saw it.  Herrera and

---

[31] *Delapaz*, 2007 Tex. App. LEXIS 9928, at *8-9.

Vega's position was that the contact did not occur, therefore no one could have seen it. One of these two versions cannot be true. All three of these witnesses were positive about their diametrically different versions; therefore someone committed perjury–knowingly made a false statement under oath with the intent to deceive. But no one suggested that any of these three witnesses is generally a liar, generally untruthful, or generally not worthy of belief.[32] These were not attacks upon the witnesses or appellant for having a bad character for truthfulness; these were accusations of lying about a specific type of event–the occurrence of a drug delivery–under a specific set of circumstances.

In these circumstances, it is at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory that Herrera and Vega were lying about these specific events and had fabricated their testimony to please the prosecution.[33] Evidence of two other nearly identical acts of purported fabrication by appellant concerning "buy-bust" deals was admissible to rebut the defense position that it was the State's witnesses who were lying about the Vega drug deal.

But appellant's primary defense was that he saw "the contact" between Alonso and

---

[32] The court of appeals mistakenly analogized this situation to that in *Webb v. State*, 36 S.W.3d 164, 180-81 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (*en banc*), in concluding that "general attacks on credibility may call into question the State's proof, but do not negate any element of the crime. Thus, it is not the type of defensive 'issue' that can be rebutted with extraneous offense evidence." *De La Paz*, 2007 Tex. App. LEXIS 9928, at * 9-11.

[33] *See Bass*, 270 S.W.3d at 563.

Vega even though no one else who was there saw it. Therefore, what he wrote in his offense report was true, and what he testified to in the former trial was true. He had no intent to deceive and he did not deceive. Period. And that raised a clear basis, rejected by the court of appeals in its denial of the State's motion for rehearing, to admit the extraneous offense evidence under the "doctrine of chances."

## C.     The Extraneous Evidence Was Admissible under Wigmore's "Doctrine of Chances."

The "doctrine of chances" tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance.[34] That is,

> if A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim . . . as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i.e., as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small.[35]

Similarly, the chance that a man innocently collects on his murdered business partner's insurance policy decreases significantly when it is learned that he collected on his murdered wife's insurance policy just three years earlier.[36]

---

[34] 2 JOHN WIGMORE, EVIDENCE § 302 at 241 (Chadbourn rev. 1979).

[35] *Id.*

[36] *See United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991):
It is not every day that one's wife is murdered; it is more uncommon still that the murder occurs after the wife says she wants a divorce; and more unusual still that the jilted husband collects on a life insurance policy with a double-indemnity provision. That the same individual should later collect on exactly the same sort of policy after the grisly death of a business partner who owed him money raises

Here, the "I saw what no one else saw" defense  becomes considerably less probable when one hears that appellant saw two other fake drug deals that no one else saw and others denied that they occurred.  The unusual or abnormal element–that appellant saw something no one else present saw (not the videographer Ledbetter, not Vega himself, not appellant's partner Herrera, nor Alonso's confederate Gonzalez)–could be innocently explained once.  Maybe appellant, as he said in his report, really did have the better view.  Or maybe everyone else saw it, too, and they were just lying.  But this unusual ability to see what no one else does becomes "curiouser and curiouser" the more it happens.[37]  And it happened twice more.

In each case, appellant's confidential informant planted fake drugs to frame an innocent person.  In each case, appellant stated in his police report that he witnessed the contact or delivery.  The extraordinary coincidence that appellant saw drug deals that no one

eyebrows; the odds of the same individual reaping the benefits, within the space of three years, of two grisly murders of people he had reason to be hostile toward seem incredibly low, certainly low enough to support an inference that the windfalls were the product of design rather than the vagaries of chance. . . . This inference is purely objective, and has nothing to do with a subjective assessment of [appellant's] character.

The fact that York's defense included innocent explanations for having insurance on [his business partner's] life and for some of his activities after [her] death underscores the relevance of [his first wife's] murder evidence to York's intent during the [instant] episode. When the defendant affirmatively denies having the requisite intent by proffering an innocent explanation for his actions, the government is entitled to rebut that argument. "Evidence of another crime which tends to undermine defendant's innocent explanations for his act will be admitted."

*Id.*

[37] *See, e.g., Fox v. State,* 115 S.W.3d 550, 559-60 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

else did three different times flies in the face of common sense. Under the "doctrine of chances," evidence of such a highly unlikely event being repeated three different times would allow jurors to conclude that it is objectively unlikely that appellant was correct in his Vega offense report or that he was truthful in his testimony that he saw contact between Alonso and Vega.[38] Whether the extraneous-offense evidence was admissible under Rule 404(b) to rebut the assertion of innocent intent is at least subject to reasonable disagreement.[39] As Auric Goldfinger, the infamous James Bond villain, said, "Once is happenstance. Twice is coincidence. The third time it's enemy action."[40] Under the "doctrine of chances," no inference about appellant's general character for truthfulness is required.[41] The fact that

---

[38] *See United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000) (district court properly admitted evidence defendant possessed and passed counterfeit notes on a prior occasion to show intent and knowledge; government had to prove three elements: possession of counterfeit notes, intent to defraud, and knowledge the notes were counterfeit; intent and knowledge were therefore facts of consequence to the case, and evidence that defendant had previously possessed and passed counterfeit notes was relevant because it decreased the likelihood that he accidentally or innocently possessed the counterfeit notes here).

[39] *See United States v. Barron,* 707 F.2d 125, 128 (5th Cir. 1983) (in perjury trial stemming from testimony at a grand-jury investigation for criminal tax fraud, associate's testimony that he committed other acts at defendant's direction on behalf of the taxpayer was relevant to show defendant's motive or intent behind the charged perjury); *United States v. Watson*, 623 F.2d 1198, 1203 (7th Cir. 1980) ("Evidence that Watson asked for complementary bids was necessary to demonstrate that he was aware of the falsity of his testimony before the grand jury."); *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975) (testimony as to defendant's connections with prior transactions in counterfeit notes was admissible to show his knowledge that the bill he passed was counterfeit).

[40] Edward J. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-character Theory of Logical Relevance, the Doctrine of Chances*, 40 U. Rich. L. Rev. 419 (2006) (quoting Ian Fleming, GOLDFINGER (Berkeley Publ'g Group 1982) (1959)).

[41] *See id.* at 432-40.

appellant reported three separate "I saw what no one else saw" drug deals decreases the likelihood that appellant saw any such drug deal, and therefore increases the likelihood that he knew that his statement about seeing one between Vega and Alonso was false.

Finally, we also agree with the trial court's ruling on appellant's Rule 403 objection.

## D.     The extraneous evidence did not run afoul of Rule 403

A Rule 403 balancing test includes the following factors:

(1)     how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable–a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

(2)     the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way;"

(3)     the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and

(4)     the force of the proponent's need for this evidence to prove a fact of consequence, *i.e.*, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.[42]

Appellant does not dispute that the extraneous offenses were probative in assessing Herrera's truthfulness about this event; rather, he asserts that this evidence was not admissible for that or any other reason. But, as we have noted, the extraneous offense evidence made facts of consequence–the falsity of appellant's statements and his knowledge that those statements were false–more likely. Furthermore, the evidence that appellant committed the extraneous acts was strong; in each instance, both the confidential informant

---

[42] *Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000).

and the set-up "dealer" testified that there was no contact or delivery.  And the extraneous

offenses occurred close in time to this offense:  one just before, and one just after.[43]  The

accuracy of appellant's statement and his knowledge of its accuracy were the two hotly

contested issues at trial, and the extraneous acts had high probative value in showing that

appellant repeatedly put false statements of what he purportedly saw during these "buy-bust"

deals in his reports.

On the other hand, we recognize that evidence that appellant orchestrated a series of

fake "buy-bust" deals could potentially affect the jury in an emotional way.  And, as

recognized by appellant and the court of appeals, a significant amount of time was devoted

to presentation of the extraneous offenses during rebuttal.  Appellant argues that there was

no need for the extraneous evidence–to prove intent or knowledge–because the State had its

witnesses' testimony and the videotape of the alleged deal.  But this is not like the case where

the "State's direct evidence clearly establishes the intent element and that evidence is not

contradicted by appellant nor undermined by appellant's cross-examination of the State's

witnesses."[44]  Here appellant stoutly denied any criminal intent and provided a plausible

defense that he was in a unique position to see what no one else could or did see.[45]  Although

---

[43] Rule 404(b) is directed toward any "other" crimes, wrongs, or acts.  Therefore, the evidence offered under the rule might be an act that occurred either before or after the charged offense.  *See Powell v. State*, 5 S.W.3d 369, 383 (Tex.App.—Texarkana 1999, pet. ref'd).

[44] *Hernandez v. State,* 203 S.W.3d 477, 479 (Tex.App.—Waco 2006, pet. ref'd).

[45] The videographer testified that his camera could not capture the inside of the bay because of the angle at which it had to be set up at.  Thus, according to appellant, the contact

the intent to kill is easily inferred from pointing a gun and shooting, the intent to defraud or to affect the course of an investigation cannot necessarily be inferred from the mere making of a statement or proof of its inaccuracy.[46]

In light of these facts, we hold that the trial court's ruling that the danger of unfair prejudice did not substantially outweigh the probative value of the extraneous offenses was not an abuse of discretion.[47] We therefore reverse the judgment of the court of appeals and

---

between Alonso and Vega wasn't on the video because the camera was not capable of capturing it, not because it didn't happen.

[46] As we noted in *Parks v. State*, 746 S.W.2d 738 (Tex. Crim. App. 1987),

In cases of forgery and fraud, it is difficult to prove intent. This Court has wisely held that intent or guilty knowledge cannot be inferred from the mere passing of a forged instrument. Indeed, to hold otherwise would create the danger that the unknowing and accidental passing of a forged instrument could effectively become a strict liability offense. The issue of intent is of such overriding importance in a case of forgery that it effectively becomes the focus of the State's case. Establishing intent in such cases is so crucial and so difficult to do that, as a practical matter, evidence of extraneous offenses is nearly always admissible. While it is hypothetically possible that a case of forgery could be established by direct evidence, such as eyewitness testimony, most cases of forgery rest on circumstantial evidence. In the vast majority of such cases, the probative value of evidence of extraneous offenses will inevitably outweigh its prejudicial effect.

*Id.* at 740 (cites omitted).

[47] *See, e.g., Springer v. State*, 721 S.W.2d 510, 512-13 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd) (in aggravated perjury prosecution of police officer for testifying that he never physically abused or mistreated prisoners, evidence of extraneous offenses that he had, in fact, done so on other occasions was admissible to prove (1) falsity of his statement and (2) his intent to deceive); *see also United States v. Burke*, 425 F.3d 400, 409-10 ( Cir. 2005) (in prosecution for perjury, evidence of defendant's prior bad acts was admissible under Rules 404(b) and 403 when offered to prove the falsity of defendant's testimony to grand jury); *United States v. Ruhbayan,* 388 F. Supp.2d 652, 660-61 (E.D. Va. 2004) (in perjury prosecution, testimony of government witnesses rebutting defendant's answers to questions about specific instances of drug dealing or firearm use, although it reflected on defendant's credibility, also served as proof of defendant's motive to lie in his prior trial and as proof that his false testimony in that trial was not a mistake or accident); *United States v. Watt*, 911 F. Supp. 538, 557-58 (D.D.C. 1995) (in

remand this case to that court to address appellant's remaining issues.

Delivered: March 25, 2009

Publish

prosecution of former Secretary of the Interior for perjury, government could introduce evidence of extraneous acts of misconduct to show defendant's intent to deceive and to show a pattern of conduct consistent with or similar to the conduct alleged in indictment, especially as there was a "clear and logical connection between the alleged earlier offenses or misconduct and the case being tried."); *People v. Ellsworth*, 15 P.3d 1111, 1114-15 (Colo. Ct. App. 2000) (in perjury prosecution of police officer, trial court did not abuse its discretion in admitting evidence of similar acts of misconduct offered to show defendant's motive and culpable mental state in using a falsified receipt at a driver's license revocation hearing).