

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00247-CR

_____

JIMMY PAUL MAHONE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 13F0381-005

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

A jury found Jimmy Paul Mahone guilty of the felony murder of Daultyn Slaten, a two-year-old boy. Mahone pled "true" to a felony enhancement and, based on the jury's assessed punishment, the trial court sentenced him to life in prison. On appeal, Mahone argues that the trial court erred in admitting evidence of his prior arrests for assault. Since we find no error, we affirm the judgment of the trial court.

## I.      Background

On the morning of September 7, 2012, Raven Baxter left Daultyn in the care of her neighbor, Robin, while she went to work. Around 4:30 p.m. that afternoon, Mahone returned from being treated at the hospital and came straight to Robin's door.[1] Daultyn had been playing and running around, but when Mahone came in, Daultyn reached up to him, and Mahone picked him up. Mahone told Robin that Raven was about to come home[2] and asked if he could take Daultyn next door. Within a few minutes, Robin heard several banging noises coming from Mahone's apartment and went next door to check on Daultyn, but the door was locked and she returned to her apartment. Shortly thereafter, Mahone's father[3] came to Robin's apartment and said Daultyn was hurt. She and Christopher followed him back to his apartment and saw Mahone holding Daultyn, who was unconscious, had a big bump on his head, and was bleeding out of his mouth and nose. Robin asked Mahone what he did, and he told her that he did not

[1]Mahone, Robin, and Raven all resided in separate apartments of a single-family residence that had been converted into three apartments. Mahone resided in the middle apartment with his father, Jimmy Glenn. Robin resided next door with her fiancé, Christopher, and Raven resided with Daultyn in the other apartment.

[2]Raven saw Mahone before she left for work and testified that she told him that she had to work until 11:00 p.m.

[3]Jimmy Glenn had been napping in his room.

2

mean to and that he was sorry. Mahone later said that Daultyn had fallen down the front steps.[4] Mahone's father called 9-1-1. When the ambulance arrived, several other neighbors came over. All testified that they heard Mahone say several times that he did not mean to do it, that he was sorry, and that he was going to jail.

Daultyn was treated at Wadley Regional Medical Center and later transferred to Arkansas Children's Hospital. At Arkansas Children's Hospital, he was determined to be brain dead and died on September 8, 2012. The treating physicians and medical examiner testified that Daultyn had suffered multiple blows to the head, face, and neck from several different directions that caused over six skull fractures, retinal hemorrhages, and severe damage to the brain. He also had a twisting fracture to one ankle, indicating someone had picked him up by the extremity and swung him. His neck also indicated that he had been strangled. The treating physicians and medical examiner testified that the injuries could not have been caused by a fall from the steps. Rather, the injuries were caused by a severe beating. All of the injuries could have been inflicted in one or two minutes.

Raven testified that, when she left Daultyn with Robin, he was "perfectly fine" with no bruises, cuts, or other injuries. Robin and Christopher testified that, before Daultyn went with Mahone to his apartment, he was walking, talking, running, playing, and uninjured. Mahone and his father told investigating officers that Daultyn was fine and uninjured when he came to their apartment. They also told investigating officers that, although they were both in the apartment at the time Daultyn was injured, Mahone's father was asleep and Mahone was alone with Daultyn.

---

[4]The front steps contained two risers and a partial riser, totaling fifteen inches in height.

## II.     There Was No Error in Admitting Evidence of Prior Extraneous Offenses

Mahone asserts that the trial court erred in allowing the State to introduce evidence of Mahone's two prior assault arrests through one of the investigating officers in this case, Matt Cashatt.  The State argues that Mahone opened the door to this evidence when his counsel claimed during his opening statement that Mahone could not have injured Daultyn because Mahone has a "genteel, calm, loving, caring nature . . . ."  The State further posits that the extraneous-offense evidence was admissible to refute the false impression Mahone left on the jury—that Mahone would not "hurt a soul"—as a result of his cross-examination of Cashatt. Finally, the State contends that even if it was error to admit the evidence, the error was harmless. Mahone, in opposition, contests that he opened the door to the evidence, denies leaving any false impression on the jury, and posits that admission of the evidence was reversible error.

Rule 404(a)(1)(A) of the Texas Rules of Evidence permits evidence of a pertinent character trait of a defendant to be admitted in a criminal case to rebut counter evidence offered by the defendant.  TEX. R. EVID. 404(a)(1)(A).  Further, Rule 404(b) allows the admission of evidence of other crimes, wrongs, or acts for purposes other than to "prove the character of a person in order to show action in conformity therewith."  TEX. R. EVID. 404(b); *Montgomery v. State*, 810 S.W.2d 372, 387–88 (Tex. Crim. App. 1991) (op. on reh'g).  Whether extraneous-offense evidence has relevance other than for character conformity is a question for the trial court.  *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).  The trial court must also balance between the probative value of the evidence and the counter factors set out in Rule

403, although the presumption is that relevant evidence will be more probative than prejudicial. *Id.*; *Montgomery*, 810 S.W.2d at 388.

We review a trial court's ruling on the admissibility of extraneous offenses under an abuse of discretion standard. *De La Paz*, 279 S.W.3d at 343; *Hernandez v. State*, 351 S.W.3d 156, 160 (Tex. App.—Texarkana 2011, pet. denied); *Duren v. State*, 87 S.W.3d 719, 728 (Tex. App.—Texarkana 2002, pet. denied). If the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion, and we uphold the trial court's ruling. *De La Paz*, 279 S.W.3d at 343–44; *Hernandez*, 351. S.W.3d at 160. A trial court's ruling is generally within the zone of reasonable disagreement if the evidence shows that 1) an extraneous act is relevant to a material, non-conformity issue, and 2) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz*, 279 S.W.3d at 344. Furthermore, the trial court's evidentiary ruling will not be disturbed if it is correct on any theory of law applicable to that ruling. *Id.*; *Hernandez*, 351 S.W.3d at 160–61; *Duren*, 87 S.W.3d at 728.

In his opening statement at trial, Mahone's counsel told the jury that Mahone "is a kind soul and this child felt comfortable around him." He also told the jury:

> We really don't know a whole lot about [Robin], but we know she hadn't been there very long, and the testimony that I anticipate you will hear will show that she has kept this child maybe three times. I don't know, we'll just develop that as this case goes along. You're going to have an inexperienced individual who is keeping a rambunctious two year old -- and we all know they don't call it the terrible twos for no good reason. What happened that day? We don't know, but I think it will be clear to you that this fifteen or so minute period when Paul had this child, that he caused no harm to him.

5

> Did the child come out and tumble down the steps?  That's what our version of events are [sic] and that's what Paul's testimony is going to be.  And I think the testimony will reveal that when Paul carried the child in the house, it was bleeding a little bit from its mouth and nose, and that increased.  It wasn't a big gash on his head that would have been bleeding profusely on any steps and outside.

He then told the jury,

> The state's going to have you believe that these -- that my client Paul Mahone grabbed this child and, in a fifteen minute whirling dervish of being a monster, caused all of these injuries to the child, and I submit to you, ladies and gentlemen, that did not happen.  Every person that testifies, I anticipate is going to testify to the genteel, calm, loving, caring nature of my client.

In cross-examining the State's medical witnesses, Mahone sought to develop the defensive theories he introduced in his opening statement.  With Dr. Robert Fry, Jr., who examined Daultyn in the emergency room, Mahone solicited testimony that the bruising and the skull fractures may not have occurred at the same time.  Fry confirmed that, if a child had pre-existing lineal skull fractures, then they could be reinjured in a fall on concrete steps.  In his cross-examination of Dr. Robert Maxson, who treated Daultyn at Arkansas Children's Hospital, Mahone solicited testimony that it is common for an individual who has a child for a period of time to become overwhelmed and frustrated and violently shake the child.  He also confirmed that Maxson could not determine that all of the skull injuries happened at the same time and that at least one of the injuries could have come from a fall.  Using hypotheticals, Mahone established that it would be possible for a child to have pre-existing lineal skull fractures, fall down steps, and cause significant brain injury.

Then, the following exchange occurred during Mahone's cross-examination of one of the investigating officers, Cashatt,

6

Q     [by Mahone's counsel]:     It wasn't a deal with [Mahone] saying, Oh, I want to take him, it's a situation where [Mahone] went up there and the child's wanting to leave with Daultyn -- I mean Daultyn's wanting to leave with [Mahone], correct?

A     My understanding was that Daultyn never had any -- Daultyn loved [Mahone].  He didn't mind being in [Mahone's] company.

Q     And would that assessment of yours be a common thread through all of the witnesses that you had spoken with?

A     Yes, sir.

Q     Everybody says that the child loved [Mahone]?

A     Yes, sir.

Q     [Mahone] had a good relationship with the child?

A     Yes.

Q     [Mahone] wouldn't hurt a -- wouldn't hurt a soul.  Is that basically what you heard from everybody?

A     Well, I don't know that he wouldn't – just that they, the child, Daultyn, did not have a problem being with [Mahone].

After a short hearing, the trial court allowed the State to introduce testimony from Officer Cashatt, over Mahone's objections, that Mahone had been arrested two times for assault.  The trial court gave the following limiting instruction regarding this testimony:

> This evidence is being admitted only to rebut the allegation that the defendant "would not harm a soul" and for no other reason.  Accordingly, you are instructed that you may consider this evidence only for the express limited purpose of deciding whether it rebuts the evidence that the defendant would not harm a soul, if it does, and you may not consider it for any other purpose.

Although not entirely clear, the trial court appears to have admitted the testimony under Rule 404(a)(1)(A) after performing a Rule 403 analysis.  However, we will uphold the trial

7

court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz*, 279 S.W.3d at 344; *Hernandez*, 351. S.W.3d at 160–61.

A defendant who presents defensive theories in his opening statement may open the door to the admission of extraneous-offense evidence to rebut those defensive theories. *De La Paz,* 279 S.W.3d at 345; *Bass v. State,* 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *Hosey v. State*, No. 06-13-00141-CR, 2014 WL 3621796, at *4 (Tex. App.—Texarkana July 23, 2014, no pet.) (mem. op., not designated for publication). In *Bass*, a pastor was accused of sexually assaulting a teenager on church property. In his opening statement, he claimed the teenager's allegations were "'pure fantasy'" and "'pure fabrication.'" In addition, he asserted that, "'[a]s a pastor and minister, he is the real deal and the genuine article . . . the things that [the complainant] said are so contrary to his character, not worthy of belief.'" *Bass*, 270 S.W.3d at 557–58. After the teenager testified, the trial court permitted the State to present extraneous-offense evidence during its case-in-chief, which showed that Bass had sexually assaulted two other girls in his church office. *Id.* at 558–59. The Court of Criminal Appeals held that the trial court did not abuse its discretion in admitting the extraneous-offense evidence to rebut the defensive theories presented in Bass' opening statement. *Id.* at 563. It pointed out that,

> it is at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory that the complainant fabricated her allegations against him and of rebutting the defensive theory clearly suggesting that appellant, as a "real deal" and "genuine" pastor, would not engage in the type of conduct alleged in the indictment. It is subject to reasonable disagreement whether this extraneous-offense evidence made these defensive theories less probable.

*Id.* (citations omitted). This applies with equal force in this case.

8

In his opening statement, Mahone posited three defensive theories: (1) that some or all of Daultyn's injuries were caused by a third party; (2) that Daultyn's injuries were accidental; and (3) that Mahone could not have caused Daultyn's injuries because he had a "genteel, calm, loving, caring nature . . . ." Before the evidence of the two assaults was admitted, Mahone sought to develop the first two theories in his cross-examination of the State's medical witnesses. By his questions to the investigating officer, Mahone sought to develop the third defensive theory—that he would not harm anyone. The assault evidence would tend to make it less likely that the injuries were caused by a third party or were accidental and that Mahone would not hurt a soul. At the least, it is subject to reasonable disagreement whether evidence of the two assaults made these defensive theories less probable. As in *Bass*, we think it is at least subject to reasonable disagreement whether the evidence of the two prior assaults was admissible for purposes of rebutting these defensive theories. *Id.*

The trial court did not abuse its discretion in admitting the evidence of the two prior assaults. The point of error is overruled and the judgment of the trial court is affirmed.


                                        Jack Carter
                                        Justice


Date Submitted:      December 5, 2014
Date Decided:        December 19, 2014

Do Not Publish