

NUMBER 13-15-00340-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MARK MERU,                                                          Appellant,

v.

THE STATE OF TEXAS,                                                  Appellee.

### On appeal from the 117th District Court
### of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Perkes, and Longoria**
**Memorandum Opinion by Justice Longoria**

Appellant Mark Meru was charged by indictment with burglary of a habitation, a

second-degree felony. *See* TEX. PENAL CODE ANN. § 30.02 (West, Westlaw through 2015

R.S.). In three issues, which we treat as two, Meru argues that (1) the trial court erred by

admitting evidence of Meru's previous burglaries, and (2) he received ineffective assistance of counsel. We affirm.

## I. BACKGROUND

At approximately 3:00 p.m. on November 8, 2011, Andrew Trevino heard a knock at his apartment door. He looked through the peephole of his door and saw a man he later identified as Meru. Trevino testified that he watched Meru through the peephole for about a minute and a half; during that time, Meru was walking back and forth between Trevino's door and the neighbor's door. Because Trevino did not recognize Meru, he ultimately decided not to answer the door. Trevino then testified that he quickly went to the bathroom and heard a loud thud at the front door. Trevino testified that he rushed to the front door to find that the molding was completely broken and the door was pushed in through the frame. Meru was walking away approximately ten feet from the front door. Trevino stated that he followed Meru for a minute or so before calling 9-1-1.

Officer Brenda Garza of the Corpus Christi Police Department (CCPD) arrived about five to ten minutes later and found Meru still near the apartments. Upon confronting Meru, Garza testified that he almost immediately responded, "I didn't do it." He then told Garza that he was helping Trevino look for the perpetrator. Meru claimed that he saw a skinny male running away from the scene of the crime. Officer Garza testified that at this point she had not even told Meru why she was there yet. Garza claimed that she asked Meru why he had not called the police to report the suspect, to which he replied by claiming that he did not have his phone with him. Garza detained Meru for further investigation and read Meru his *Miranda* rights. According to Garza, she asked Meru at

2

this point if he was the one that knocked in Trevino's door, and he asserted again that he did not do it.

Garza testified that Meru told her the following: his personal belongings were in his car because he recently broke up with his girlfriend; and he was at the apartments to look for a friend named John Contreras. However, Meru did not know his apartment number so he knocked on Trevino's door hoping to find him. When nobody answered, he went back to his car to look for his phone to call his mother to help him find out where Contreras lives. When he was near his vehicle, he heard a loud sound and saw a skinny male running away. Trevino came out shortly afterward. Garza testified that Meru appeared extremely nervous while giving this explanation of events; she stated that he was slurring his words a lot and sweating profusely. After hearing Meru's version of events, she asked him where his vehicle was. Garza claims that Meru did not answer until she told him that she already knew where his car was since she had looked up the license plate number.

Officer Allen Shelton of the CCPD also arrived at the scene. He testified during trial that Meru's car was parked immediately in front of Trevino's apartment, with the keys in the ignition and the windows rolled down. Shelton testified that the car contained many personal belongings, mostly clothing and personal items; the only items that stood out to him were three watches. Shelton also testified that he has been involved with thousands of burglaries over twenty-three years of police service. He testified that a vast majority of doors are kicked in during burglaries and that the process of kicking in a door leaves distinctive marks. For example, normally a scuff mark or an entire footprint is left behind, which is "very discernable." However, he testified that Trevino's door had no such

3

markings. To the contrary, Trevino's entire door frame was pushed in, which Shelton testified "implies more that it – a large area of the door was pushed at one time." Shelton then added that pushing down the door in blunt fashion, like Trevino's door was, is very uncommon and requires a large amount of strength and size. According to Shelton, smaller people do not have the strength to perform such a feat.

Dana Garza, the owner of the apartments, testified that no one named John Contreras ever lived at the apartments. She stated that no one by that name was ever listed as a lessee and that she never heard of anyone by that name living with any of the other lessees as a guest.

CCPD Investigator Joe Garza testified that he interviewed Meru at the police station shortly after he was taken into custody. His interview with Meru was video recorded. After Meru was read and signed his *Miranda* rights, Garza asked Meru if he had been arrested before. Meru admitted that he had been previously convicted of burglary; he then conveyed his concern that he was going to lose this case because of his past convictions. However, Meru insisted that he did not commit this crime. Meru then told Investigator Garza why he was at the apartments. Meru claimed during the interview that he was looking for his friend Juan Cavazos. During trial, Garza testified that Meru paused for a long time before saying Juan Cavazos, as if "trying to think what name he had given before." The interview lasted about an hour but only twelve minutes were shown to the jury during trial; however, the entire video was entered into evidence and available for the jury to view during deliberation. The jury returned a guilty verdict. After the jury found Meru guilty, the trial court assessed punishment at twenty-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice upon

4

finding Meru to be a habitual felony offender with two previous convictions for burglary. *See* TEX. PENAL CODE ANN. § 12.42(d) (West, Westlaw through 2015 R.S.).

Meru filed a motion for new trial, which the trial court denied. On appeal, this Court reversed and granted the motion for new trial. The State appealed to the Court of Criminal Appeals, which reversed this Court's decision and upheld the trial court's denial of the motion for new trial. *See State v. Meru*, 414 S.W.3d 159, 164 (Tex. Crim. App. 2013).

The Court of Criminal Appeals then granted Meru an out-of-time appeal on June 3, 2015, so that he could appeal the original conviction itself. This appeal of the underlying proceeding ensued.

## II. EXTRANEOUS OFFENSE EVIDENCE

By his first and second issues on appeal, Meru argues that the trial court abused its discretion by admitting extraneous offense evidence. Meru argues that evidence of the extraneous offenses were inadmissible under 403 and 404 of the Texas Rules of Evidence. *See* TEX. R. EVID. 403, 404.

### A. Standard of Review and Applicable Law

We review the admission of extraneous-offense evidence for abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.* at 304.

Generally, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). However, this type of evidence may be admissible for other purposes, "such as proving motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake, or *lack of accident*." TEX. R. EVID. 404(b)(2) (emphasis added). In other words, extraneous offense evidence can be used to prove the "system" or "modus operandi" of the defendant if that system tends to prove a material issue on trial. *Owens v. State*, 827 S.W.2d 911, 914 (Tex. Crim. App. 1992). Thus, when an objection is made to extraneous offense evidence under Rule 404, the proponent of the evidence has the burden of persuading the trial court that the evidence has relevance apart from character conformity. *See Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990) (en banc) (op. on reh'g).

Rule 403 states that a trial court may exclude relevant evidence if the evidence's probative value is substantially outweighed by one or more of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. However, courts presume that the probative value of relevant evidence exceeds any potential danger of unfair prejudice until proven otherwise. *See Montgomery*, 810 S.W.2d at 389.

When the trial court erroneously admits evidence, it is usually considered a non-constitutional error, meaning that we will disregard the error as long as the substantial rights of the party that is complaining were not affected. *See Lopez v. State*, 288 S.W.3d 148, 165 (Tex. App.—Corpus Christi 2009, pet. ref'd). Substantial rights are not affected by the erroneous admission of extraneous acts if the appellate court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *See id.* To determine whether the error adversely influenced the jury, we consider:

6

(1) testimony or physical evidence admitted for the jury's consideration; (2) the nature of the evidence supporting the verdict; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) the jury instructions; (5) the State's theory and any defensive theories; (6) closing arguments; (7) voir dire; and (8) whether the State emphasized the error.

*Id.* at 157.

## B. Discussion

### 1. Rule 404

The State argues it offered evidence of Meru's previous crimes because it served as evidence of a "common scheme" or modus operandi. The State told the court that Meru's previous burglaries alluded to his modus operandi of using brute force to open doors, which was a relatively rare method of opening doors, according to Officer Shelton. Admitting this video evidence of Meru's past did not establish a material fact, establish a modus operandi of the defendant, or serve any purpose listed in Rule 404. *See* TEX. R. EVID. 404. The video never established that Meru's modus operandi is to use brute force to open doors. It merely brought to the jury's attention that Meru had been previously convicted for burglary. We agree with Meru that that it was an abuse of discretion to admit this particular evidence of his extraneous acts. We now look at the factors to determine whether admitting the evidence was harmful. *See Lopez*, 288 S.W.3d at 157.

The extraneous evidence of Meru's prior convictions were of a nature to be potentially injurious because they were also for burglaries. This could lead the jury to improperly find Meru guilty based on his propensity to commit the charged offense. However, the extraneous acts were only mentioned a handful of times during trial. Primarily, the evidence of Meru's previous convictions for burglaries came from Meru himself during the video record of the interview with Garza. In response to Garza's

7

questioning, Meru admitted that he had been convicted of burglary before. Investigator Garza also testified about Meru's previous convictions, but this was done outside the jury's presence. The previous convictions were never even mentioned during voir dire. The only other time Meru's previous convictions were actually mentioned was during closing argument. The State's closing argument comprises approximately six pages of the record, with only four lines on a single page mentioning the previous convictions.[1] The main thrust of the closing argument, and the State's theory during trial, was that Meru's story did not "make any sense." The State put more emphasis on the argument that there was just too much circumstantial evidence pointing to Meru to be coincidence. Furthermore, during the jury charge, the trial court read the following instruction:

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in the case, you cannot consider that testimony for any purpose, unless you find and believe beyond a reasonable doubt that the defendant committed the other offense, if any were committed, and even then you may only consider same in determining the identity, motive, opportunity, intent or plan of the defendant in connection with the offense, if any, alleged against him in the indictment in this case and for no other purpose."

We presume that jurors follow the trial court's instructions as presented. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (finding that the defendant was not harmed by the erroneous admission of evidence because the defendant did not overcome the presumption that the jury followed the trial court's instructions).

---

[1] The State only mentioned the following during closing argument in reference to Meru's past burglaries: "What's the reasonable conclusion there, ladies and gentlemen? What is reasonable? He could do that. And he told you he did -- he had done that before, on the video, said, 'Yeah, I did it.' Same manner. Tried to make, 'Well, something that happened 17 years ago.' Yeah, we may all have done stupid things 17 years ago, but, in the same fashion, the same form, similar circumstances?"

8

Having considered all of these factors, we can say with fair assurance that the judgment was not "substantially swayed" by the error of admitting Meru's previous convictions. *See Lopez*, 288 S.W.3d at 179. The State put very little emphasis on Meru's previous convictions and instead focused on the strength of the compiled circumstantial evidence. The jury would have likely focused on the strength of the circumstantial evidence, as well. Therefore, we conclude that the error was harmless. We overrule Meru's first issue.

### 2. Rule 403

The harm analysis for erroneously admitted evidence is the same, regardless of which rule of evidence applies. *See Lopez*, 288 S.W.3d at 165. Thus, our analysis for Meru's second issue would be the same as that for his first issue. Therefore, assuming without deciding that evidence of Meru's past convictions were also inadmissible under Rule 403, we conclude that the error was nonetheless harmless and did not affect Meru's substantial rights. *See id.* We overrule Meru's second issue.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

In his third issue, Meru claims that he received ineffective assistance of counsel. Specifically, he argues in three sub-issues that his trial counsel was ineffective by: (1) failing to discover the video evidence during pre-trial investigation; (2) failing to object to his lack of notice of the video; and (3) failing to object to the video as a whole or failing to redact portions of video.

### A. Standard of Review

A claim for ineffective assistance of counsel is analyzed under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed under this test, the record

9

must demonstrate both that trial counsel's performance was deficient and that the defendant suffered prejudice as a result. *Menefield v. State,* 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012). Trial counsel should normally be afforded an opportunity to explain his or her actions before being proclaimed as deficient, especially if counsel's reasons for failing to take an action do not appear in the record. *Id.* If trial counsel has not been given an opportunity to explain its actions, "then the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Id.* Thus, direct appeal is usually an inadequate tool for claims of ineffective assistance because the record has not been developed sufficiently to make such findings. *Id.*

A defendant suffers prejudice when there is a "reasonable probability" that the result of the proceeding would have been different but for counsel's errors. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

**B. Discussion**

Meru claims that his trial counsel's performance undermines confidence in the outcome of the trial. *See id.* But Meru's trial counsel was never afforded an opportunity to explain his actions; courts are hesitant to declare a counsel's performance as deficient until they have been afforded an opportunity to explain themselves. *See Menefield,* 363 S.W.3d at 592. More importantly, Meru has not established a "reasonable probability" that the result of the proceeding would have been different had the video evidence been discovered, objected to, and/or redacted. *See Thompson*, 9 S.W.3d at 812. Meru's trial

10

counsel's actions were not "so outrageous that no competent attorney would have engaged in it." *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

However, even assuming without deciding, that Meru's trial counsel's performance was deficient, we cannot conclude that Meru suffered prejudice as a result. *See Menefield,* 363 S.W.3d at 592. As we concluded above in the previous sections, the video evidence of Meru admitting to past convictions more than likely had a very insubstantial impact on the trial outcome. Meru's admissions were hardly emphasized by the State, and there was sufficient circumstantial evidence apart from the admissions for the jury to find Meru guilty. We overrule Meru's third issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

Nora L. Longoria
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
26th day of May, 2016.