

NUMBER 13-10-00273-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**SAMUEL AGUILAR,**                                                                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                                    **Appellee.**

---

### On appeal from the 130th District Court
### of Matagorda County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Rodriguez**

A jury found appellant Samuel Aguilar guilty of the murder of James Sutton and assessed life in prison and a $10,000.00 fine. *See* TEX. PENAL CODE ANN. § 19.02 (West 2003). By four issues, Aguilar contends that: (1)-(3) the trial court abused its discretion in admitting certain evidence; and (4) the evidence is insufficient to establish that he committed murder. We affirm.

## I. BACKGROUND[1]

It is undisputed that Sutton, a seventy-year-old man with whom Aguilar was acquainted, was found dead in his home on May 27, 2009. According to Chief Medical Examiner Steven Pustilnik, M.D., Sutton was bludgeoned to death on Memorial Day, May 25, 2009.

Patrol Officer Scott Sherrill, who was first on the scene at Sutton's residence on Wednesday, May 27, testified that there were large amounts of blood throughout the house, including blood spatter across the dining room walls and ceiling, blood on the kitchen floor where they found shoe prints, and blood droplets which he described as small pools of blood indicative of gravitational drops—blood dripping off something. Officer Sherrill testified that there was blood spatter and tissue throughout the kitchen and hallway area. The investigating officers found more blood in the breezeway and in the garage. In addition, Texas Ranger Kip Westmoreland, who worked with the Bay City Police Department on this case, testified that a closer view of the bloodstains in the dining room revealed cast-off bloodstains from blood that was cast off of the weapon used to inflict the blow. According to Ranger Westmoreland, this occurred as the weapon was on its back swing preparing for another blow. Ranger Westmoreland also agreed that in addition to the bloody footprints in the kitchen, there were bloody footprints in the bathroom, and there appeared to be blood in the bathroom sink area where someone washed up, blood on the door leading to the garage, a bloody footprint on the back doorstep, blood on the garage door, and a bloody footprint inside the garage.

---

[1] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

Tommy Lytle, a crime scene investigator with the Bay City Police Department who was the lead detective on this case, testified that during the course of the investigation, Aguilar's name was brought to his attention. Ranger Westmoreland also testified that he learned early in his investigation Aguilar had mowed Sutton's lawn and was in and out of Sutton's house frequently. Detective Lytle and Ranger Westmoreland also became aware that Aguilar's brother, Benny Aguilar, lived a short distance from Sutton's residence. With Benny's consent, they searched his residence. They noticed a bloodstain on the front door. Officers found a purple mountain bike behind Benny's house. It was later determined that the bike belonged to Aguilar and that it had a bloodstain on the left handbrake of the handlebar. They also discovered a wet T-shirt inside a tightly tied plastic bag in a carport trash can outside Benny's residence. Both Detective Lytle and Ranger Westmoreland testified that the T-shirt appeared to have bloodstains on it. The stains were later confirmed to be blood. The distinctive logo on the bloodstained T-shirt was the same logo seen on a shirt Aguilar had been wearing on Memorial Day at approximately 5:00 p.m. at the E-Z Pawn Shop when surveillance cameras there captured him on video.

Detective Lytle testified that after obtaining a search warrant for the travel trailer where Aguilar lived, they found a pair of wet blue and white tennis shoes under the dining table. The shoes had "reddish color stains around the sole area" that the officers believed to be blood. They also found a pair of baggie blue jean shorts in the bathroom. The shorts were in a five-gallon bucket filled with a clear liquid.

According to Detective Lytle and Ranger Westmoreland, Aguilar was not located until 2:00 a.m. on the Thursday following Sutton's murder when he was found hiding in the

3

grass under a tree in a field near the apartment of his friend, Debra Trevino.   A search of Trevino's apartment produced, among other things, a baseball cap belonging to Aguilar. The cap appeared to have a bloodstain on it.

After Aguilar was taken into custody, investigating officers, including Detective Lytle and Ranger Westmoreland, interviewed Aguilar five times over the next several days.   Both investigators testified that Aguilar first claimed that he had not committed the offense and that he had not been in or around Sutton's residence on Memorial Day. However, after being confronted with a witness who placed him there on that day, Aguilar admitted he may have gone to that residence to use the phone.   And after being told that his bloody T-shirt had been found, Aguilar appeared "[a] little bewildered" and told the officers that he wanted to have some time to think about it, that he did not want to incriminate himself any more than he already had, and that he wanted to be taken back to the detention facility.   The next evening, Aguilar admitted he had walked into Sutton's house on Memorial Day, and upon entering the house, he tripped over Sutton's body. Because it was dark inside, Aguilar lit a match,[2] saw Sutton lying on the floor, and tried to wake him.   Aguilar informed Detective Lytle that he then turned on a light switch, and because Sutton did not respond and Aguilar had a bad "reputation" with the police, he fled out the front door.   Aguilar told the officers that he exited the same way he had entered and that he had not gone anywhere else in the house.

Ranger Westmoreland testified that Aguilar denied having any knowledge of the baseball cap during the initial interviews.   Later, Aguilar admitted that the baseball cap belonged to him but that he found it and had no idea how the blood got on it.   Aguilar also

---

2 Aguilar later changed his story and said that he used a flashlight.

4

told Detective Lytle and Ranger Westmoreland that he knew he had blood on his shirt, tried to wash it, and threw it away because he could not remove the blood. According to Ranger Westmoreland, Aguilar told the officers "that the blood got on his shirt from when he wiped his hands on his shirt after he got blood on his hands from touching Jim Sutton." Ranger Westmoreland testified that Aguilar's explanation was inconsistent with the patterns of blood on the shirt. According to Ranger Westmoreland, after Aguilar's T-shirt was sprayed with luminal, a blood-revealing reagent that reacts with iron in the blood, the luminal reacted with the blood on the front of Aguilar's shirt, revealing primary stains that appeared to be blood-spatter stains and not stains from a wipe or a smear. Ranger Westmoreland also testified that, after the back of the shirt was sprayed with luminal, the blood pattern appeared "to be consistent with [Aguilar] wearing that shirt and striking blows to Jim Sutton and then cast-off stains onto the back of the shirt from the object that he was being struck with."

Detective Lytle testified that as Aguilar was given "bits of evidence, that's how he concocted his story." Detective Lytle agreed that as he fed Aguilar information, his story would change slightly, every step of the way: "[h]e seemed to not remember until he found out that there was some evidence pointing in his direction." On cross-examination, Detective Lytle agreed that no one had told him that Aguilar had had any type of physical or verbal altercation with Sutton.

Fayth Davis, a forensic scientist with the Texas Department of Public Safety (DPS) crime lab in Houston, Texas, testified that laboratory tests confirmed that "the shoe impressions lifted from [Sutton's] linoleum are consistent in size, shape, and tread design" with Aguilar's shoes. Davis testified that it was her opinion "those shoes on the floor

5

[Aguilar's shoes] could have made the impressions on the linoleum or any other shoe that looks just like those."   On cross-examination, Davis stated that she was not able to say how the apparent blood got on the shoe or that it was definitely Aguilar's shoes that made the imprints.

Jennifer Watson, a forensic scientist and technical leader in the DNA Department of the DPS crime lab in Houston who was part of a crime scene investigation team for this case, confirmed that the DNA analysis of the blood at Sutton's house matched the blood on Aguilar's T-shirt and baseball cap, as well as the brake handle of the bike and a bloodstain on his brother Benny's front door.   The DNA profile from the stain on Aguilar's shoe was also consistent with Sutton's DNA profile.   In addition, Watson explained that based on her analysis of a partial DNA profile from inside the right sneaker, if the shoes were found in Aguilar's residence, it is consistent with her results that Aguilar has worn these shoes.   Finally, of the twenty-four spots tested on the shirt, twenty-two spots found all over the back and the front of the shirt were positive for apparent blood, and from the DNA analysis of that blood, she could not exclude Sutton.

Finally, Robbie Martinez, Aguilar's ex-girlfriend, testified that, during the middle of the week prior to Memorial Day 2009, Aguilar accused her of having oral sex with Sutton for money.[3]   When she denied it, Aguilar, who was "very angry," told her that she had better not go to Sutton's house without him.   And after threatening to cut her up "[f]rom one end to the other," Aguilar grabbed Martinez's hair and cut some of it with a knife. According to Martinez, a few days later, while she and Aguilar were arguing about many things, including those things that prompted the threat earlier in the week, Aguilar

---

[3] On cross-examination, Martinez agreed that Aguilar asked her not to take advantage of Sutton because he cared about Sutton and did not want to disrespect him.

stomped her—kicked her in the back—while she was lying on the floor. Martinez testified that after she was kicked, she went to the hospital for treatment.

## II.   DISCUSSION

### A.   ADMISSION OF EVIDENCE

By three issues, Aguilar contends the trial court abused its discretion when it admitted the following evidence:   (1) testimony of prior assaults by Aguilar on Martinez; (2) photographs showing bruises to Martinez's body allegedly caused by Aguilar; and (3) testimony provided by Melissa Gonzales, a pawnbroker, that Aguilar told her he would be going to prison.

### 1.   Unadjudicated Prior Assaults

In his first issue, Aguilar complains that the trial court erred in allowing Martinez to testify that Aguilar cut her hair and kicked her in the back.   Aguilar claims that this testimony was prejudicial and unnecessary to connect him to Sutton's murder.

During the State's direct examination, Martinez testified to the accuracy of State's Exhibits 171 through 174, which included a photograph of her cut hair and three photographs of the bruises on her back.   Martinez also agreed that she was in the hospital around Memorial Day.   Following this testimony, the State asked Martinez, "Was that one of the times when your relationship [with Aguilar] was kind of off?" Martinez responded, "Yes."   When the State began to ask another question regarding Martinez and Aguilar, defense counsel asked for a conference outside the presence of the jury.

At the bench conference, defense counsel objected to the anticipated testimony on the basis that it was prejudicial because it involved a number of unadjudicated offenses,

7

one of which had nothing to do with Sutton.   The State responded that the evidence it sought to elicit regarding events that occurred within the week prior to the incident went to Aguilar's state of mind and his motivation for why he may have wanted to kill Sutton.   The trial court overruled Aguilar's objection.

Without further objection, Martinez testified that Aguilar threatened her, cut her hair, and kicked her after they argued about her activities with other men, including Sutton.   After Martinez provided this testimony, Aguilar requested a limiting instruction. In open court, the trial court instructed the jury that the evidence was admitted only for the purpose of showing Aguilar's motive, if any.   The trial court provided a similar instruction in its jury charge.

### a.   Preservation of Error

The State argues on appeal that Aguilar did not preserve this issue.   However, we conclude that counsel's objection to the admissibility of Aguilar's prior unadjudicated offenses made at the bench conference—a hearing outside the presence of the jury—satisfied Texas Rule of Evidence 103(a).   *See* TEX. R. EVID. 103(a) ("[W]hen the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections."); *Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005) (providing that the following two exceptions apply to the requirement of subsequent objections set out in appellate rule 33.1:   (1) counsel may obtain a running objection; or (2) counsel may request a hearing outside the presence of the jury); *see also* TEX. R. APP. P. 33.1(a).   Therefore, no other objection was necessary, and we conclude Aguilar preserved this issue for appeal.

8

### b. Applicable Law

Under Texas Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith" but may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b). The proponent of uncharged misconduct evidence, the State in this case, must be able to explain the logical and legal rationales that support its admission on a basis other than "bad character" or propensity. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (citing TEX. R. EVID. 404(b)). For example, the proponent may persuade the trial court that the other crime, wrong, or act has relevance apart from character conformity because it tends to establish some evidentiary fact, such as motive, leading inferentially to an elemental fact, such as identity. *See Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001) (citing *Montgomery v. State*, 810 S.W.2d 372, 387-88 (Tex. Crim .App. 1991) (en banc) (op. on reh'g)).

Although relevant, however, the evidence may still "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. According to the Texas Court of Criminal Appeals, the rule 403 balancing test includes the following factors:

> (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

9

(2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and

(4) the force of the proponent's need for this evidence to prove a fact of consequence, *i.e.*, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*De La Paz*, 279 S.W.3d at 348-49.

### c. Standard of Review

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court."   So, too, is a ruling on the balance between probative value and the counter factors set out in Rule 403, although that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence.   Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard.   As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld.   A trial court's ruling is generally within this zone if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.

*Id.* at 343 (quoting *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)) (other citations omitted).

### d. Discussion

In this case, it is at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the non-character-conformity purpose of showing Aguilar's motive.   *See id.*   Although Aguilar does not deny that one of the incidents involved an argument about Martinez's involvement with Sutton, he does argue that the incident where he allegedly kicked Martinez in the back had nothing to do with

10

Sutton but rather with her past actions. However, the evidence of extraneous offenses which occurred very close in time to the charged offense tends to establish motive, an evidentiary fact which would lead inferentially to an elemental fact, such as identity. *See Powell*, 63 S.W.3d at 438 (citing *Montgomery*, 810 S.W.2d at 387-88). Thus, we conclude that the trial court's ruling was generally within the zone of reasonable disagreement. *De La Paz*, 279 S.W.3d at 348-49. The trial court, therefore, did not abuse its discretion in deciding that the extraneous-offense evidence was admissible to show motive.

We also conclude that the danger of unfair prejudice did not substantially outweigh the probative value of the extraneous-offense evidence. *See* TEX. R. EVID. 403; *De La Paz*, 279 S.W.3d at 348-49. First, we have already concluded that the extraneous-offense evidence made an evidentiary fact more likely. Furthermore, the evidence that Aguilar committed the extraneous acts was strong. And the extraneous offenses occurred close in time to this offense. In addition, the amount of time devoted to presentation of the extraneous-offense evidence was not significant, and the trial court instructed the jury to use the evidence only to establish motive, if any. Moreover, this evidence was not of such a nature as to impair the effectiveness of the limiting instruction; the events described by Martinez were not likely to create such a prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose. Finally, Aguilar's identity was a contested issue at trial, and the extraneous acts had high probative value in showing he had a motive. Therefore, based on this analysis, we conclude that the trial court's ruling was generally within the zone of reasonable agreement. *See De La Paz*, 279 S.W.3d at 343. Accordingly, we overrule

11

Aguilar's first issue.

## 2. Photographs

In his second issue, Aguilar challenges the admission of State's Exhibits 171 through 174.  When the photographs were offered in the trial court, Aguilar's counsel made the following objection to State's Exhibit 171:  "Objection, your Honor, to this photograph coming in based on the fact that this is—this is an unadjudicated case. There's been nothing to offer up that Mr. Aguilar cut her hair on this incident, your Honor." Aguilar also objected to the introduction of State's Exhibits 172 through174—photographs that showed bruising on Martinez's back—but provided no basis for his objection.  The trial court overruled Aguilar's objections and admitted the exhibits.   The State claims that Aguilar has not preserved this complaint on appeal.   We agree.

On appeal, Aguilar argues that the photographs were "highly inflammatory and prejudicial" and relies on case law that sets out factors that a court may consider in determining the probative value of photographs.  *See Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim App. 2010).   This argument does not match the objections made below. Therefore, this complaint has not been preserved for our review.  *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (citing TEX. R. APP. P. 33.1(a)(1)(A) & TEX. R. EVID. 103(a)(1)) ("[I]t is well settled that the legal basis of a complaint raised on appeal cannot vary from that raised at trial.").   We overrule Aguilar's second issue.

## 3. Aguilar's Statement that he "was going to prison for a long time"

By his third issue, Aguilar complains that the trial court erred in admitting the following testimony offered by Gonzales after she testified that Aguilar had come into her pawn shop at approximately 5:00 p.m. on Memorial Day 2009 and sold her a DVD player

12

and a propane lantern:

> Q.  Okay.  Did he—during the course of your conversation with him, did he say anything about going to prison?
>
> A.  He said he didn't need the items anymore.  So, he just wanted to sell 'em 'cause he was going to go away for a long time.
>
> Q.  That he was going to go to prison for a very long time?
>
> A.  Uh-huh.

Counsel for Aguilar objected to this testimony on the basis that "the case that [she] would be referring to is an unadjudicated pending case," and therefore, "this testimony is prejudicial and any probative value is substantially outweighed."  The trial court overruled the objection.

On appeal, the State urges that the testimony is not extraneous-offense evidence because there was no description of any specific offense.  We agree.

"An extraneous offense is defined as any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers."  *Rankin v. State*, 953 S.W.2d 740, 741 (Tex. Crim. App. 1996).  While Gonzales's testimony that Aguilar said "he was going to go away [to prison] for a long time" arguably suggests that Aguilar committed an act of misconduct for which he would be going to prison, we cannot conclude that Gonzales's testimony is evidence of a specific act of misconduct that is not shown in the charging papers.  *See Rankin*, 953 S.W.2d at 741.  Rather, as noted by the trial court when it overruled Aguilar's objection, the response made by Aguilar appeared to refer to the instant case and was not related to an earlier offense that had yet to go to trial.  We, therefore, conclude that the trial court did not abuse its discretion when it overruled Aguilar's objection and admitted Gonzales's testimony.  We overrule

13

Aguilar's third issue.

## B. SUFFICIENCY OF THE EVIDENCE

By his fourth issue, Aguilar contends that the evidence submitted at trial was not sufficient to establish that he committed the murder of Sutton.

### 1. STANDARD OF REVIEW AND APPLICABLE LAW

In a sufficiency review, courts examine the evidence in the light most favorable to the verdict to determine whether "*any* rational fact finder could have found guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ("[T]he *Jackson* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."). This standard requires reviewing courts to resolve any evidentiary inconsistencies in favor of the judgment, keeping in mind that the fact-finder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Brooks*, 323 S.W.3d at 899; *see* TEX. CODE CRIM. PROC. art. 38.04 (West 1979) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony . . . ."). Appellate courts do not re-evaluate the weight and credibility of the evidence; they only ensure that the jury reached a rational decision. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).

Legal sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this case,

14

Aguilar committed murder if he intentionally or knowingly caused the death of Sutton. *See* TEX. PENAL CODE ANN. § 19.02(b)(1).

## 2. DISCUSSION

Aguilar contends that the evidence presented at trial is only sufficient to show he was present at the scene of the murder and made contact with the body of the deceased. Aguilar directs this Court to testimony provided by officers at the scene explaining that there was nothing found in the home or near Sutton's body that "pointed to Aguilar" and to his defensive theory that the DNA evidence which was collected and tested was consistent with Aguilar's admission of finding and touching the body. However, the evidence at trial, summarized in relevant part below, included the following:

- Aguilar knew Sutton and was at Sutton's house frequently;

- Aguilar's bloodstained bike and T-shirt were found at Benny's house which was located a short distance from Sutton's residence;

- A bloodstain on Benny's front door matched Sutton's blood;

- Aguilar initially told the officers that he had not been at Sutton's house on Memorial Day; however, after being confronted with a witness who placed him there, he admitted he may have gone to the residence to use the phone;

- After being confronted with additional evidence, Aguilar altered his story a number of times;

- Sutton was bludgeoned to death;

- After allegedly discovering Sutton's body, Aguilar fled the house and did not tell anyone about what he had found;

- Aguilar claimed that the only part of the house he had been in was the living room area, but there was blood all over other parts of the house, including bloody footprints that were consistent in size, shape, and tread design with Aguilar's shoes;

15

- Aguilar claimed that the blood on the front of his shirt came from having wiped his hands after touching Sutton to try to get him to respond, but, according to Ranger Westmoreland, the bloodstains on the front of Aguilar's shirt were more representative of blood spatter stains than stains from a wipe or a smear;

- The configuration and position of the blood on the back of Aguilar's shirt was not consistent with Aguilar's story, but was consistent with him striking Sutton such that the blood from the object used was cast off onto the back of his shirt;

- Within the week prior to Sutton's murder, Aguilar had accused his girlfriend of having had oral sex with Sutton for money and had become angry and physically violent toward her; and

- Aguilar said that he was going to go away for a long time, that he was going to go to prison for a very long time.

Considering the entire trial record, viewing the evidence in the light most favorable to the verdict, and giving "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," we conclude that a rational jury could have found beyond a reasonable doubt that Aguilar committed Sutton's murder. *See Jackson*, 443 U.S. at 319; *Laster*, 275 S.W.3d at 517; *see also* TEX. PENAL CODE ANN. § 22.02. We overrule Aguilar's fourth issue.

### III. CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
14th day of July, 2011.

16