

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---------------------------------------------

No.  02-17-00236-CR
No.  02-17-00237-CR

---------------------------------------------

MYRON JAMAL NASH, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court Nos. 1482186D, 1482194D

Before Sudderth, C.J.; Gabriel and Pittman, JJ.
Opinion by Justice Gabriel

## MEMORANDUM OPINION

Appellant Myron Jamal Nash appeals his convictions for sexual assault and for tampering with physical evidence. *See* Tex. Penal Code Ann. § 22.011(a)(1) (West Supp. 2017), § 37.09(a)(1) (West 2016). Nash argues in four points that (1) the evidence was insufficient to support his sexual-assault conviction based on the complainant's trial recantation and (2) the trial court abused its discretion by admitting extraneous-offense evidence, by failing to conduct a balancing test on the record, and by giving an insufficient limiting instruction. Because we conclude that the jury had a rational basis upon which to find Nash guilty of sexual assault, that the trial court did not abuse its discretion surrounding the admission of the extraneous-offense evidence, and that Nash failed to preserve any error arising from the trial court's limiting instruction, we affirm the trial court's judgments. *See* Tex. R. App. P. 43.2(a).

## I. BACKGROUND

### A. RELATIONSHIP HISTORY

Nash and Vera[1] married in 2001 and by 2011, they had five children. Their relationship was volatile, with Nash repeatedly physically abusing Vera. Vera's aunt saw Vera's injuries, including a swollen face. In 1999 while they were living together, Nash attempted to suffocate Vera by putting a pillow over her face and was convicted of assault. Based on this incident, Vera obtained a protective order against Nash. In 2003, Nash left with their oldest child and threatened to never return although he

---

[1]As did the State in its briefing, we refer to the complainant by an alias.

2

eventually returned the child unharmed. When Vera was in the hospital in 2004 after having her second child, she and Nash got in an argument, and Vera's father told Nash to "keep his hands off" Vera.[2] When Vera was in the hospital after giving birth to her third child with Nash, hospital staff asked Nash to leave after Nash apparently hit Vera.[3] After giving birth to her fifth child in 2011, Vera had a tubal ligation. Nash became very angry and accused Vera of committing "a genocide."

Nash and Vera divorced in 2015, but Vera allowed Nash to frequently stay with her and the children so he could spend time with them. In 2015 during an argument, Nash damaged one of Vera's eyes such that she had to wear an eye patch and permanently lost vision in that eye. In October 2016, Nash and Vera got into an argument while the children were present, and Nash cut Vera's neck with a knife. Vera later stated that she fell down the stairs when Nash grabbed her arm in an attempt to wrest her phone away, Nash "kind of sat" on her at the bottom of the stairs "to try to make sure [Vera] was okay," and Vera "felt blood" from a cut. Nash took Vera to the hospital and told a nurse that Vera had fallen. Vera's neck required stitches. Two days later, Vera reported the incident to the police and got a second emergency protective order against Nash.

---

[2]Vera testified that she did "not recall" this incident.

[3]At trial, Vera admitted that hospital staff asked Nash to leave. But when the State asked Vera if Nash was asked to leave because he had hit Vera, Vera stated, "I don't think he hit me, no."

## B.  Offenses at Issue

On December 30, 2016, Vera called her sister at 7:00 a.m. and in a "shaky, weird" voice asked how her sister's children were, even though Vera had seen them the day before, and asked if it was possible for her phone to be "clone[d]."[4]  The conversation concerned Vera's sister because of the early hour and because the questions were unusual.  Vera's sister told Vera that she was calling the police because she "had a feeling that Myron Nash was in her home" in violation of the protective order.  Vera did not try to stop her sister from doing so.

Officer Jack White, one of the officers who was dispatched to respond to Vera's sister's 911 call, confirmed the existence of the protective order against Nash before going to Vera's house to check on her welfare.  White knocked and waited several minutes before Vera "barely open[ed]" the door.  Vera denied that Nash was there but she continually seemed to look at someone behind her, was crying, and appeared frightened.  Vera's behavior convinced White that Nash was in the house.  Indeed, Nash was standing by the door where White could not see him while Vera talked to White.  Because White knew there were children in the home and because Nash had a history of family violence, officers set up a barricade around the house and a lengthy stand-off ensued with officers using a public-address system to repeatedly order Nash to come out of the house to no avail.

---

[4]Vera explained that she asked her sister about cloning because Nash was fixated on her relationship with another man and seemed to be intercepting her text messages.

4

During the stand-off, two of the children came outside but they denied that Nash was in the house. In White's experience, "if a child denies a person being in there when it's obvious that they're there, when there's a strong suspicion there, it's because they're . . . trying to protect their father or the person that we were asking about." At some point, Vera, who was visibly upset, also came out of the house to check on the children. When Vera confronted an officer and attempted to go back inside the house, the officer handcuffed her and put her in the back of a police car. White explained that officers do not allow anyone leaving a house during a stand-off to return in the interest of officer safety and because the perpetrator has less leverage with fewer people in the house.

Vera's aunt arrived shortly thereafter to check on Vera's children. Vera told her aunt that Nash was still inside the house with one child and would not let that child come out. Vera also said that she had woken up that morning to find Nash on top of her having sex with her. Vera had insomnia and routinely took a sedative to sleep, which Nash was aware of. Vera was upset and emotional as she told her aunt about the assault. An officer overheard Vera's allegations and began questioning her about them. Vera later testified that she told the officer about the assault because the officer threatened her, stating her children would be taken away, after Vera would not say what the officer "wanted to hear." Vera's aunt, who was present during the officer's questions, later testified that the officer did not force Vera to make the sexual-assault allegations against Nash. An investigating detective asked Vera to come

to the station and give a statement, which Vera agreed to do. An unnamed relative drove Vera to the police station, where Vera repeated her allegations and gave details about Nash's assault, including him forcing her legs apart and her repeated attempts to stop him. During the interview, Vera was upset, placing her head on the table to cry after the detective left the room. The detective requested that Vera get a sexual-assault exam, which Vera consented to do that same day. Vera's aunt immediately took Vera to a local hospital for a sexual-assault exam.

During Vera's exam, Vera told the nurse examiner, Melissa Cahill, that she had awakened at approximately 12:30 a.m. with Nash penetrating her vagina with his penis until he ejaculated. Vera told Cahill that in order to have sex with her, Nash had to "pry" her legs apart after she had "locked" them "at the ankle." Vera was unsure if Nash penetrated her anus with his penis because she lost consciousness. But Vera remembered "punch[ing] at" Nash before "turn[ing] [her] head to the left" in defeat. Vera's physical exam revealed no evidence of trauma, which did not surprise Cahill because Vera was in a drowsy state caused by her sedative. The vaginal swabs taken during Vera's exam contained DNA that matched Nash's DNA profile. After her exam, Vera consented to an interview with the investigating detectives. Vera said that she repeatedly told Nash "no" during the attack, that he pried her legs apart, and that she unsuccessfully tried to force him to stop.

Meanwhile, the stand-off with Nash continued. Officers, who had surrounded the house, saw Nash peer over the back fence and "put his hands up over it like he

6

was going to climb over it." An officer told Nash "to stop," and Nash went back into the house and locked the back door. The stand-off lasted approximately five hours before Nash came out of the front door holding one of his children in front of himself "like a human shield." Officers arrested him and told him he was being charged with violating a protective order. Nash acknowledged that he had violated the protective order and asked an officer if there were any additional charges against him. The officer told Nash that she was aware only of the protective-order violation.

While Nash was being processed into the jail, officers asked Nash for his clothes, which they were collecting to help in the sexual-assault investigation. Although the officers apparently did not tell Nash they needed his clothes to investigate a sexual assault, Nash was reluctant to take them off. While he was undressing, an officer verbally noted that Nash was wearing a t-shirt, pants, and a pair of boxers. When the officers stepped out of Nash's cell to find jail clothes to issue to him, they heard the toilet in the cell repeatedly flushing. When they returned, Nash only had the t-shirt and pants. A video recording of Nash's cell showed that Nash had flushed his underwear down the toilet. The underwear could not be retrieved.

### C. PRETRIAL AND TRIAL

A grand jury indicted Nash in two indictments with the sexual assault of Vera and for tampering with evidence, each including a repeat-offender notice that alleged Nash had been convicted of burglary of a building in 1993. The sexual-assault

indictment also included a notice that the alleged offense involved family violence. *See* Tex. Code Crim. Proc. Ann. art. 42.013 (West 2018).

Nash was briefly released from jail in January 2017 on bond. He went to Vera's house, where they began to argue. Nash hit Vera, splitting her lip and making her face swell.

The State notified Nash pretrial that it intended to introduce several "convictions, adjudications and extraneous offenses," including his prior assaults on Vera and his violations of the protective orders. *See* Tex. R. Evid. 404(b)(2). At the beginning of the trial outside the jury's presence, the State informed the trial court that it intended to proffer testimony from Vera regarding seven distinct instances of Nash's misconduct against her: (1) the 2000 suffocation, leading to the entry of a protective order that Nash later violated; (2) the 2003 incident when Nash left with their oldest child and threatened to not return; (3) his expulsion from the hospital in 2004 after Vera gave birth to their third child; (4) his 2015 assault that caused Vera to be blind in one eye; (5) the 2016 knife incident, injuring Vera's arm and neck, that resulted in his indictment for aggravated assault and a second emergency protective order; (6) his violation of the second protective order by being at Vera's house on December 30, 2016; and (7) his assault of Vera while he was out on bond in 2017. The State asserted that these extraneous bad acts were admissible "to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or lack of accident." *See id.* Nash objected to their admission under rule 404(b), arguing

8

that none involved sexual assault, which was the crime charged. The trial court overruled Nash's objections and stated that these extraneous acts were admissible under rule 404(b). The court also ruled that the State could mention the domestic violence in its opening argument to the jury: "So the Court will permit the State to go into those specific, discrete extraneous offenses that you just enumerated on the record. So you will be permitted to go into them during opening statement also." Nash then objected, with no explanatory argument, that the extraneous acts were inadmissible under "rule 403," which the trial court overruled.[5] *See* Tex. R. Evid. 403.

At trial, Vera testified to Nash's extraneous bad acts and protective-order violations, occurring before December 2016 and in January 2017.[6] But regarding the events of December 2016, Vera stated that the sex was not "a force situation" and that Nash "doesn't have to do much to convince [her] to have sex with him." Further, Vera swore to an affidavit of nonprosecution before trial, which Vera said was accurate but had been "prefilled" when she signed it at Nash's attorney's office. The jury found Nash guilty of sexual assault and evidence tampering. The trial court heard punishment evidence, including Nash's thirteen prior convictions for various offenses; found the repeat-offender notices true; and assessed his sentences at thirty

---

[5]The State also sought admission under article 38.371, and the trial court later ruled that these extraneous acts were not admissible under that article.

[6]During Vera's testimony, Nash objected on the basis of rule 403, rule 404(b), the Confrontation Clause, and the Due Process Clause. The trial court overruled these objections.

years' and ten years' confinement, respectively and to run concurrently. The sexual-assault judgment included a finding that it involved family violence. *See* Tex. Code Crim. Proc. Ann. art. 42.013; *see also Thomas v. State*, 150 S.W.3d 887, 888 (Tex. App.—Dallas 2004, pet. ref'd) (discussing sentencing effect of family-violence finding under article 42.013).

## II.  SUFFICIENCY: SEXUAL-ASSAULT CONVICTION

In his first point, Nash contends that the evidence was legally insufficient to support his conviction for sexual assault. He argues that because consent was the only contested issue at trial and because there was no physical evidence to support the State's theory, Vera's testimony rendered the jury's finding of guilt irrational. In our due-process review of the sufficiency of the evidence to support Nash's conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the elements of sexual assault beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

Here, Vera testified that she consented to have sex with Nash and later signed an affidavit of nonprosecution. But on the day of the offense, she told her aunt, an officer at the scene, and a detective that Nash forced her to have sex and made the same allegations to Cahill, the nurse examiner. Vera testified that she told the officers the sex was nonconsensual because she felt she had to in order to keep her children and because she thought that is what they wanted to hear. But Vera's aunt testified

that Vera was not forced to say that Nash sexually assaulted her and that Vera was very emotional and upset about Nash's actions, which the detective observed as well.

The jury, as the finder of fact, was entitled to weigh the evidence and its credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979). We cannot second-guess these determinations by concluding as urged by Nash that the jury "should have believed" Vera's trial testimony and disregarded her statements to her aunt, police officers, and Cahill on the date of the offense. *See Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016), *cert. denied*, 137 S. Ct. 1207 (2017); *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). To do so would be far outside our role as a court of deference. *See Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016); *Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015); *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). The jury heard testimony that Nash forced Vera to have sex, prying her legs apart and ignoring her protests. Vera's trial testimony to the contrary did not negate that evidence, most of which was Vera's same-day account of the incident. *See Bautista v. State*, 474 S.W.3d 770, 776 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Saldaña v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi 2008, pet. ref'd); *Salley v. State*, 25 S.W.3d 878, 881 (Tex. App.—Houston [14th Dist.] 2000, no pet.). We defer to the jury's findings and conclude that the evidence was sufficient to support Nash's sexual-assault conviction. We overrule Nash's first point.

## III.  EXTRANEOUS-OFFENSE EVIDENCE:
## SEXUAL-ASSAULT AND TAMPERING CONVICTIONS

In his remaining three points, Nash asserts that the trial court's rulings and instructions surrounding the admission of the extraneous-offense evidence were abuses of its discretion.  In point two, he argues that the trial court abused its discretion by admitting this evidence because it was nothing more than character-conformity evidence, which is inadmissible.  *See* Tex. R. Evid. 404(b)(1).  He also argues that the admission was an abuse of discretion because the trial court failed to limit the evidence to only those instances identified by the State, allowing the State to raise in opening arguments "a generalized, non-specific domestic violence situation."  Finally, he asserts that the State did not prove each prior bad act "in a legally proper manner."

We review the admission of extraneous-offense evidence for an abuse of discretion.  *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).  Such evidence is admissible when it has relevance beyond character conformity—"proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Tex. R. Evid. 404(b)(2); *see Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003).  Even though relevant, such evidence may be excluded if its probative value is substantially outweighed by its unfair prejudicial effect.  *See* Tex. R. Evid. 403; *Moses*, 105 S.W.3d at 626.

Nash's assertion that the State improperly proved up the extraneous-offense evidence apparently is in reference to his assertions that the State questioned

witnesses about these bad acts by referring to exhibits that had not been admitted into evidence, by "confus[ing]" the procedure to refresh a witness's recollection with impeachment, and by using leading questions. During trial, Nash did not object on these bases to the witnesses' testimony and exhibits he references in his appellate briefing.[7] These arguments were not preserved for our review. *See* Tex. R. App. P. 33.1(a)(1).

Nash next argues that during its opening argument to the jury, the State asserted that the domestic violence between Nash and Vera was "ongoing" and consisted of "two decades" of "prior incidences." Nash contends that these statements and other similar characterizations were outside the specific prior acts that the trial court previously ruled admissible and rendered the admission of all of the extraneous-offense evidence during the trial an abuse of discretion. But opening statements are not evidence, and the State's jury arguments that Nash and Vera's relationship was fraught with violence did not impermissibly stray from the parameters of the trial court's ruling, which expressly contemplated their mention

---

[7]And in the argument portion of his brief, Nash states in general terms with no citation to the record or to relevant authority that the record "is replete" with the State's impermissible "attempts to elicit testimony from witnesses with no personal knowledge of the matter in question, leading questions, questions seeking hearsay responses, reading from documents not in evidence, improper impeachment, and the repeated failure to properly seek to refresh the recollection of witnesses." This is insufficient to direct our attention to his specific complaints. *See* Tex. R. App. P. 38.1(i); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008). But we have addressed his argument based on the more specific deficiencies he pointed to in the statement-of-facts portion of his brief. *See* Tex. R. App. P. 38.1(f), 38.9.

during jury arguments. *See Hutch v. State*, 922 S.W.2d 166, 173 (Tex. Crim. App. 1996) (plurality op.). And again, Nash did not object to the State's arguments to the jury on the grounds that the State violated the trial court's admissibility ruling, which procedurally defaults his argument on appeal. *See* Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(1).

Finally, we address Nash's main argument directed to the admission of the extraneous-offense evidence: it was inadmissible because it had no probativeness apart from character conformity. We conclude this evidence was admitted for purposes apart from character conformity. Before trial, Vera signed an affidavit of nonprosecution, forcing the State to issue a subpoena to ensure her presence at Nash's trial. Nash's prior violence and the nature of his relationship with Vera was relevant to explain why her trial testimony differed from her statements to the police and Cahill and was more than mere character-conformity evidence. *See, e.g.*, *Garcia v. State*, 201 S.W.3d 695, 702–03 (Tex. Crim. App. 2006); *Gonzalez v. State*, 541 S.W.3d 306, 312 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Graves v. State*, 994 S.W.2d 238, 247 (Tex. App.—Corpus Christi 1999, pet. ref'd, untimely filed). In short, the extraneous-offense evidence tended to show Nash's intent, motive, and the absence of mistake, rendering it admissible under rule 404(b)(2). *See generally De La Paz*, 279 S.W.3d at 343 (recognizing rule 404(b) is a rule of inclusion, not exclusion). The trial court did not abuse its discretion by admitting this evidence under rule 404(b). We overrule point two.

14

In a related point—point three—Nash argues that the trial court abused its discretion by admitting the extraneous-offense evidence over his rule 403 objection because it did not conduct the required balancing test on the record. Nash (1) failed to specify in his objection the rule-403 grounds that rendered this evidence inadmissible and (2) did not ask the trial court to perform a balancing test or object to the trial court's failure to do so. This argument was not preserved for our review. *See Jones v. State*, 982 S.W.2d 386, 395 (Tex. Crim. App. 1998); *Damm v. State*, No. 02-16-00380-CR, 2018 WL 1528605, at \*14 (Tex. App.—Fort Worth Mar. 29, 2018, pet. ref'd) (mem. op., not designated for publication). But assuming this argument were preserved, a trial court is presumed to have performed the required balancing test even if the record is silent. *See Reyes v. State*, 480 S.W.3d 70, 77 (Tex. App.—Fort Worth 2015, pet. ref'd). We overrule point three.

In his fourth point, Nash contends that the trial court's "global" limiting instructions directed to the admission of the extraneous-offense evidence were improper and abuses of its discretion. Four times during the trial, the trial court gave the jury a limiting instruction at Nash's request regarding its consideration of the extraneous-offense evidence in substantially the same form:

> And, ladies and gentlemen, the State is introducing evidence of extraneous offenses, and they're introducing them for the purpose of showing the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident of the defendant, if any, and you may consider evidence of these extraneous offenses for those purposes and for no other purposes. Additionally, you may not consider them at all unless you believe beyond a reasonable doubt that they occurred.

15

Nash did not object to the any of these verbal limiting instructions raising the grounds he now asserts on appeal. This argument has been procedurally defaulted, and we overrule point four. *See Johnson v. State*, 709 S.W.2d 345, 347 (Tex. App.—Houston [14th Dist.] 1986), *pet. dism'd on reh'g*, 786 S.W.2d 709, 710 (Tex. Crim. App. 1989).

## IV. CONCLUSION

We conclude that the evidence was sufficient to support Nash's conviction for sexual assault. Nash's arguments directed to the admission of the extraneous-offense evidence either do not show an abuse of the trial court's discretion or were not preserved for our review. Accordingly, we affirm the trial court's judgments.

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 20, 2018

16