

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00019-CR
_____

CHRISTOPHER REDIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1781164

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

A Tarrant County jury convicted Christopher Redin of dating violence assault by occlusion, a third-degree felony. *See* TEX. PENAL CODE ANN. § 22.01(b)(2)(B), TEX. FAM. CODE ANN. § 71.0021(b). The trial court sentenced Redin to ten years' imprisonment. On appeal,[1] Redin complains that the trial court erred in admitting evidence of domestic violence assaults he committed against other women and in failing to grant a mistrial upon the admission of testimony referencing the charges arising from the extraneous assaults. Because we conclude the trial court did not err in admitting the evidence of extraneous domestic-violence offenses nor in denying a mistrial, we affirm the trial court's judgment.

## I. Factual and Procedural Background

Redin and Eleksis Anders began living together sometime after meeting through an online dating app in January 2023, where Redin used the pseudonym Karis Royce. Anders later met Redin, in person, at a hotel in Killeen, the city where he lived. The next day, Anders returned home to Tarrant County, and Redin went with her. Redin had told Anders he was planning a trip to California. Anders expected him to stay a week or two, but he stayed for a month. Initially, their relationship was pretty good, but things soon started to change.

Anders testified the first instance of violence occurred as Redin and Anders showered together. Redin did not like the way Anders was bathing him and pushed her. Anders fell and was hurt. Redin apologized.

---

[1]This appeal was transferred to this Court from the Second Court of Appeals pursuant to a Texas Supreme Court docket equalization order. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). Accordingly, we apply the precedent of the Second Court of Appeals in deciding this case to the extent that it conflicts with our own. *See* TEX. R. APP. P. 41.3.

Anders testified to another incident where Redin accused Anders of sleeping with her neighbor because he saw her near the neighbor's apartment door, even though Redin was only away from Anders for about three minutes. Redin pushed Anders into a closet inside the front door of her apartment, even as Anders tried to reassure Redin that what he suspected did not happen.

Anders further testified that Redin would go through Anders's phone. Once, at about 3:00 a.m., Redin woke her, naming all the men in her phone, asking about text messages and pictures, even from before she met him. Redin told Anders that if she could not explain all of the messages and pictures of men in her phone, he would throw her phone on the roof of her apartment.

Anders stated that Redin went to California and then returned about two months later. The forty-eight hours after Redin returned to Texas formed the basis of Redin's dating violence charge. Soon after Anders retrieved Redin from the bus station, they began fighting. Redin entered Anders's room and threw her on her bed, breaking it. Redin held Anders's arms above her head and was on top of her, while she was trying to get away from him. Anders was screaming for help, and Redin asked if she was trying to get her "neighbor boyfriend" to come save her. Anders told Redin that she felt like she could not breathe, and she testified that Redin told her if she did not stop screaming, he would "bash [her] head out the window." She testified that Redin said, "Texas doesn't play about domestic violence cases, and you're screaming and somebody is going to call the police, and I have this open case in California."

3

As Anders testified about that incident, Redin objected, stating that Anders's reference to the open case in California was a violation of his motion in limine. Redin moved for a mistrial, which the trial court denied. During the later testimony of one of the investigating officers, the officer repeated Anders's statement given during her interview that Redin had similar charges in California. Redin again objected and moved for a mistrial, and the trial court again denied the motion.

Anders continued to testify about the forty-eight hours after Redin's return from California. While Redin, Anders, and Anders's son were in her car, with Redin driving, he began speeding and stopping abruptly, which frightened Anders and her son. Later that evening, the three were eating with Redin's family when someone asked Anders's son what he was eating. Anders answered for her son, which angered Redin. Anders stated Redin told her to go outside, where he got in her face with his eyes bulging, pointed in her face, and told her that her five-year-old son was "a man and he can speak for himself." She testified that after they returned home that night, Anders was bathing her son, and Redin got mad, saying she "was flirting with [her] son."

Anders told Redin to leave, and he was gone for about two hours. Meanwhile, Anders contacted Redin's mom and her own dad about her and Redin's arguments. Redin returned to Anders's apartment very angry because Anders had told his mother about an incident where he ripped off Anders's shirt and "threw a freshly baked biscuit at [her] so hard that it cut the bridge of [her] nose." She testified that as their fighting escalated, Redin ripped her dress off and choked her. She said he put her in a chokehold, with his forearm around her neck, and dragged

4

her around her apartment. Anders was not able to breathe and thought she was going to die. She said Redin had her in a chokehold for about a minute, and she came to after he let her go. She stated Redin then dragged her by her hair to the bathroom, where she sat on the toilet, and he choked her again with his hands around her throat. She testified that Redin told her that they "were going to fight all night" and that "he was going to hit [her]." She stated Redin did hit her, punching her in her forearm, on her upper thigh, and on her butt.

During that incident, Anders's mother came to the apartment, and her father began calling. When her mother knocked, Anders told her mother to leave because she did not want her to get hurt. Anders's mother called the police. When the police arrived, they interviewed Anders, and she told one of the officers that Redin had choked her and that Redin had similar charges in California. The officers arrested Redin for dating violence.

Redin was later charged. He pled not guilty and proceeded to trial. Prior to trial, the trial court held an evidentiary hearing on the admissibility of extraneous-offense evidence regarding two women in California against whom Redin previously committed domestic assaults. The trial court deferred ruling on the admissibility of the evidence until after it heard Anders's testimony.

During trial, after hearing Anders's testimony, the trial court indicated that it believed certain questions in Redin's cross-examination had opened the door for the admission of the extraneous-offense evidence. The trial court ruled that the extraneous-offense evidence was admissible. The State then presented two witnesses, J.C. and M.C., who testified about similar domestic violence assaults Redin committed against them in California.

J.C. testified that she met Redin in 2018 and began dating him in late 2019. J.C. knew Redin under the names Redin, Karis, Royce, Farmer, and West. During their relationship, Redin often took her car and would not return it even when asked to. Redin also asked her for money and used J.C.'s debit card so much that she was unable to pay for food for herself and her children.

J.C. further testified that in December 2019, Redin became angry about another man, yelled at J.C., and threw her things, breaking them. Another time, J.C. was asleep, and Redin woke her by dragging her out of bed because he was angry about something he saw on her phone. Redin demanded that J.C. tell him the truth. He then put her back into bed, put his hands around her neck, and choked her, making it difficult for her to breathe.

J.C. stated in the car, sometimes when Redin was driving, he would become angry at her, and he would "karate chop" her across her neck and chest. Sometimes Redin would pull to the side of a road, into an alley, or behind a building and get J.C. out of the car to punch or slap her.

J.C. testified that in October 2020, Redin accused J.C. of lying to him. She said he took her into the garage of her house and began beating her. Redin used a roll of wrapping paper, striking J.C. across the face. During that episode, she stated Redin also beat her with a belt and his hands. J.C. testified that Redin backed her up against a wall and choked her with one hand, making it hard for her to breathe. She said that Redin beat her for hours in the garage, telling her he would stop if she told the truth. Redin and J.C. then went upstairs, and while Redin was in the shower and J.C. was in the bathroom, he "kept on hopping back and forth out of the shower . . .

6

slapping [her] across the face." She testified that Redin also struck her with a bamboo backscratcher.

J.C. stated that Redin eventually left, and law enforcement was called. When they arrived, they took several photographs of J.C.'s injuries and the implements Redin used to beat her. Those photographs were admitted into evidence. Redin was charged and eventually found guilty of false imprisonment and domestic battery and not guilty on some other charges.

M.C. testified that she also had a criminal case pending against Redin. M.C. met Redin in August 2022. She said Redin first introduced himself as Royce, and M.C. later learned his name was Chris. She stated that Redin moved in with M.C., saying he "need[ed] a place to stay for a couple of days," but that "turned into a couple of weeks and a couple of months." M.C. said that Redin often tried to access her cell phone for evidence that she was seeing other men. She said Redin had no money, and she supported him by paying for food and other necessities.

M.C. testified about an incident when she said something Redin did not like, and in response, Redin "grabbed [M.C.'s] throat really hard" and held it for a few seconds. M.C. told Redin "that was not okay," and Redin apologized.

In September 2022, M.C.'s goddaughter gave her a phone number on a piece of paper of someone related to M.C.'s work. M.C. testified that Redin believed the phone number was for an "intimate connection" and that M.C. and her goddaughter were making fun of him. The mood escalated, with Redin continuously accusing M.C. of lying and resulted in Redin screaming at M.C., pushing her up against the wall, and ripping off her shirt. She testified that Redin hit her on her legs and buttocks with his fists and a belt. She said Redin also grabbed her throat,

squeezing both sides of her neck and making it difficult for her to breathe. She testified that the physical attack lasted for hours. After that incident, M.C. said that her family members told Redin to leave. M.C. called the police, and charges were filed against Redin in Humboldt County, California.

A week later, Redin contacted M.C. through social media, and they reconnected. They planned a trip to San Francisco for early October. Before they left, they encountered a friend of M.C.'s on the street. M.C. said her friend confronted Redin and tried to grab M.C.'s keys from Redin's hand. Redin became livid. M.C. said Redin then drove her to San Francisco, driving erratically and dangerously and stopping several times, even in the middle of the road. She stated that one time, she locked Redin out of her car, and he reacted by punching and shattering the driver's side window.

M.C. testified that Redin's rage continued after they arrived at a San Francisco hotel, and the next morning, he threw M.C.'s phone at a picture, breaking both the phone and the picture. M.C. got her phone fixed at a mall. They left the hotel and, instead, slept in M.C.'s car. M.C. said she told Redin she needed to leave, but he would not let her. She stated they went to a park to walk, and Redin took her phone and keys and left her with her car for two hours. A day later, M.C. managed to leave Redin when he was inside a gas station, but he again contacted her through social media, stating he wanted her back.

M.C. testified that in December 2022, they talked again. In January, M.C. stopped in Texas to see Redin on her way to New York. While she was there, she said they stayed at the home of a friend of Redin and that Redin accused her of having sex with his friend. After M.C.

went to New York, about a month later, she again stopped in Texas for about a week to see Redin on her way back to California.

At the end of March 2023, M.C. testified that Redin visited her at a hotel two hours south of her home in California. During that visit, she stated that Redin became angry at her at a grocery store and pinned her against an outside wall, choking her. On the way back to the hotel after that, she stated that Redin drove erratically and then parked the car and began to abuse her. He slapped her, acted like he would punch her in the stomach, and, putting his hands around her neck, choked her so that she could not breathe. When they reached the hotel, Redin continued to attack M.C. in the car in the parking lot, hitting, squeezing, and wrestling with her, and then choking her until she gave him the passcode to her new phone.

In the hotel room the next morning, M.C. testified that Redin woke her up at 5:30 a.m., continuing to beat her. Redin smacked M.C. across the face, busting her lip open, got on top of her in the bed and strangled her with both hands, struck her legs and buttocks, and repeatedly threw her to the floor. M.C. stated that she managed to text her sister a prearranged code, and her sister called the police.

When the police arrived, they took M.C.'s statement and photographed her injuries. Redin was arrested and charged in Mendocino County, California.

Several photographs were entered into evidence through M.C., including photographs of the shattered driver's side window on M.C.'s car and her injuries resulting from her and Redin's physical encounter.

The trial court gave a written-limiting instruction regarding extraneous offenses in the guilt-innocence jury charge. The jury found Redin guilty, and the trial court assessed his punishment at ten years' imprisonment. Redin appeals.

## II. Admission of Extraneous-Offense Evidence

Redin's first two points of error complain of the trial court's admission of evidence of extraneous domestic-violence offenses against him.

### A. Standard of Review and Applicable Law

"[A] trial judge's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard." *Irsan v. State*, 708 S.W.3d 584, 616 (Tex. Crim. App. 2025) (alteration in original) (quoting *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009)). "So, too, is a ruling on the balance between probative value and the counter factors set out in Rule 403, although that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence." *Id.* (quoting *De La Paz*, 279 S.W.3d at 343). "This is so because we presume that probative value outweighs prejudicial value 'unless in the posture of the particular case the trial court determines otherwise.'" *Id.* (quoting *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g)). "Accordingly, as long as the judge's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the ruling will be upheld." *Id.* (quoting *De La Paz*, 279 S.W.3d at 343–44). "Further, if the trial judge's ruling is correct on any applicable legal theory, the ruling will stand." *Id.* (citing *De La Paz*, 279 S.W.3d at 344).

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id.* (quoting TEX. R. EVID. 404(b)(1)). "But '[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" *Id.* (alteration in original) (quoting TEX. R. EVID. 404(b)(2)).

"Article 38.371[ of the Texas Code of Criminal Procedure], which applies to family-violence prosecutions, provides another non-character-conformity purpose for admitting extraneous-offense evidence." *James v. State*, 623 S.W.3d 533, 545 (Tex. App.—Fort Worth 2021, no pet.) (citing TEX. CODE CRIM. PROC. ANN. art. 38.371).

> Although the statute explicitly prohibits the admission of character evidence that is otherwise prohibited by the Rules of Evidence or other laws, it expressly allows "evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . . , including testimony or evidence regarding the nature of the relationship" between the accused and the complainant.

*Id.* at 545–46 (quoting TEX. CODE CRIM. PROC. ANN. art. 38.371(b), (c)). "Thus, Article 38.371(b) expressly allows extraneous-offense evidence regarding the nature of the relationship between an accused and a complainant." *Id.*

Another "well-established rationale for admitting evidence of uncharged misconduct is to rebut a defensive issue that negates one of the elements of the offense." *Irsan*, 708 S.W.3d at 616 (quoting *De La Paz*, 279 S.W.3d at 343). "That is, 'a party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive

11

evidence that undermines an elemental fact.'" *Id.* (quoting *De La Paz*, 279 S.W.3d at 343). "Further, the defendant's opening statement may open the door to the admission of extraneous offense evidence to rebut opening statement defensive theories." *Id.* (citing *De La Paz*, 279 S.W.3d at 344–45).

"That said, 'a court may exclude' otherwise admissible evidence 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.'" *Id.* (quoting Tex. R. Evid. 403).

### B.     Analysis

In his first two points of error, Redin argues that the trial court erred in admitting evidence of other "domestic violence episodes" (1) that "were not relevant apart from character conformity," and (2) the probative value of which "was substantially outweighed by unfair prejudice." As did Redin, we combine our discussion of those two points.

#### 1.     Relevance apart from character conformity

Redin first claims that the evidence in the form of testimony from two witnesses who claimed he previously committed family violence against them was relevant only for purposes of proving his conformity of character and is thus inadmissible. Redin relies on *Montgomery* for the proposition that "if extraneous evidence is not 'relevant' apart from supporting an inference of 'character conformity,' it is absolutely inadmissible under Rule 404(b)" of the Texas Rules of Evidence. *Montgomery*, 810 S.W.2d at 387. While Redin acknowledges that evidence relevant to a non-character-conformity purpose is admissible, he argues that the extraneous family-

12

violence-offense evidence presented facts that were "wholly unconnected to an elemental fact" before the trial court and were thus not facts of consequence and were inadmissible.

But the Texas Court of Criminal Appeals has held that extraneous-offense evidence is admissible to rebut an accused's trial theory that the complainant fabricated her claims against him. In *Bass v. State*, the defendant similarly contested the admissibility of extraneous-offense evidence that he had committed other sexual assaults, claiming the evidence was offered and used "solely for a character-conformity purpose." *Bass v. State*, 270 S.W.3d 557, 562 (Tex. Crim. App. 2008). The Texas Court of Criminal Appeals specifically addressed the question of whether "specific instances of extraneous misconduct" were admissible "to show the victim did not 'fabricate' her account of [appellant's] crimes." *Id.* (alteration in original). The court considered and agreed with the State's argument that "[b]y showing that the victim's allegations are less likely to be fabricated, the evidence directly rebuts the defensive claims and has logical relevance aside from character conformity." *Id.* at 563 (citations omitted); *see Robinson v. State*, Nos. 02-24-00189-CR & 02-24-191-CR, 2025 WL 1840566, at *9 (Tex. App.—Fort Worth July 3, 2025, no pet.) (mem. op., not designated for publication) (finding that a defendant accused of committing family violence against his wife and stepson made a fabrication defense when "[i]n the defense's voir dire, opening statement, and cross-examination, [the wife and stepson's] credibility was called into question with the suggestion that they were lying so that [the wife] could retain the parties' marital property in their divorce"); *see also Wright v. State*, No. 02-24-00307-CR, 2025 WL 2264205, at *2 (Tex. App.—Fort Worth Aug. 7, 2025, no pet.) (mem. op., not designated for publication) ("[A] party may open the door to the admission of

13

otherwise inadmissible extraneous-offense evidence by examining a witness in a way that creates a false impression that the admission of the extraneous-offense evidence would correct.").[2]

At trial, Redin's defensive theory was that Anders was lying. Before trial, at the hearing on the admissibility of the evidence, Redin argued that denying that a crime had occurred and questioning the credibility of the accuser should not constitute a fabrication defense which opens the door to the admission of extraneous evidence. The trial court responded by noting that Redin's conduct against J.C. and M.C. appeared to be consistent with that against Anders and that the allegations by M.C. were very near in time to those by Anders, being only two months apart. While the trial court refrained from ruling on the admissibility of the extraneous-offense evidence at that time, it admonished Redin by stating, "[I]f the testimony of . . . Anders is consistent with the type of behavior that has been testified by [J.C. and M.C.], you may have a problem." The trial court continued by saying, [Y]ou've got to walk a fine line."

In his opening statement, Redin said,

We will contend that [the evidence is] not there. . . .

. . . .

Ms. Anders is going to testify that for the next [forty-eight] hours . . . Redin either hit, slapped, punched, or choked her, strangled her. . . .

But [you will] see body cameras. You'll see photographs. You may even see medical reports. And the proof [is not] there.

---

[2]The Fort Worth Court of Appeals has stated that it "consider[s] unpublished opinions with similar facts instructive and cite[s] them in agreement with their guidance as to the application of settled law." *Thetford v. State*, 643 S.W.3d 441, 451 n.19 (Tex. App.—Fort Worth 2022, pet. ref'd) (op. on remand) (quoting *Cain v. State*, 621 S.W.3d 75, 81 n.8 (Tex. App.—Fort Worth 2021, pet. ref'd)).

14

During Anders's cross-examination, Redin challenged Anders's veracity, implying that she did not fight back, she did not suffer the claimed injuries, she did not seek help, and she had changed her story. Specifically, Redin questioned Anders about her fingernails, noting that they were long enough and that she could have scratched Redin while he was strangling her; her hospital visit a few days after the forty-eight hour incident, when they checked "just [her] knee," "[n]o other body part," and that she had a prior knee injury; the victim impact statement Anders completed about two weeks after the forty-eight hour assault, noting it was the "first time" she reported hair loss from Redin pulling her across the floor; Anders's affidavit completed a little more than a month after the incident, as it indicated Redin threw her on the bed face down, with her face in a pillow, yet she testified at trial that he was on top of her holding her hands above her head; and the fact that Anders had her cell phone throughout the ordeal, yet she did not use it to seek help—she only texted her mother four or five times and did not call the police or 9-1-1.

Like the trial court in *Bass*, we likewise conclude here that evidence of Redin's extraneous domestic-violence conduct directly rebuts his trial theory that Anders fabricated her allegations against him. The trial court in *Bass* concluded, and we find applicable here, "it is at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory that the complainant fabricated her allegations against him." *Bass v. State*, 270 S.W.3d at 563. The categorization of the defense is not the linchpin of this analysis. *See id.* at 563 n.8 ("The issue does not necessarily turn on the type of defense presented, but on whether the extraneous-offense evidence has noncharacter-conformity relevance by, for example, rebutting a defensive theory or

making less probable defensive evidence that undermines an elemental fact.").  Like the trial court in *Bass*, the trial court here did not abuse its discretion in admitting the extraneous-offense evidence of Redin's other acts of domestic violence.

### 2.    Probative value weighed against unfair prejudice

Redin's second point urges that the trial court erred in admitting the extraneous-offense evidence because its probative value was substantially outweighed by unfair prejudice.  *See* Tex. R. Evid. 403.  An appellate court reviewing a trial court's Rule 403 analysis must "measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is made." *Perkins v. State*, 664 S.W.3d 209, 217 (Tex. Crim. App. 2022).  The relevant criteria includes:

> (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable; (2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way"; (3) the time needed to develop the evidence; or (4) the force of the proponent's need for this evidence to prove a fact of consequence.

*Id.* (quoting *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)).  Stated differently, a Rule 403 balancing

> test requires the court to balance (1) the evidence's inherent probative force and (2) the proponent's need for that evidence against the evidence's tendency (3) to suggest a decision on an improper basis or (4) to confuse or distract the jury from the main issues, (5) the possibility that a jury that is ill-equipped to evaluate the evidence's probative force would give it undue weight, and (6) the likelihood that the evidence's presentation will consume an inordinate amount of time or merely repeat evidence already admitted.

*Hance v. State*, 714 S.W.3d 775, 811 (Tex. App.—Fort Worth 2025, no pet.) (citing *Giglioblanco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)).  Rule 403, however,

16

carries a presumption that relevant evidence will generally be more probative than prejudicial. *Irsan*, 708 S.W.3d at 616.

We consider first the trial court's determination of the inherent probative force of the extraneous-offense evidence. *Id.* This factor "is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense." *Mozon*, 991 S.W.2d at 847 (quoting *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (citing *Montgomery*, 810 S.W.2d at 389–90)). The testimony of Redin's two other domestic violence victims, J.C. and M.C., was significantly probative of the fact that Redin did, in fact, commit domestic violence against Anders.

Further, the extrinsic-offense evidence shows that Redin employed many of the same methods against all three women. *See Hampton v. State*, No. 02-24-00402-CR, 2025 WL 2423516, at *3 (Tex. App.—Fort Worth Aug. 21, 2025, no pet.) (mem. op., not designated for publication) ("[B]ecause the . . . extraneous offense was very similar to the charged offense, the complained-of evidence's inherent probative force was very strong."). In the case of all three of these victims, Redin used aliases before revealing his real name; was motivated by paranoid jealousy or anger at perceived disloyalty; demanded access to his victims' phones, questioning their fidelity; choked them with his hands or by pinning them against a wall; used a belt or other implement to beat them; punched their bodies; threw or dragged them; used a vehicle to terrorize them by erratic driving or to confine them during physical abuse; and assaulted them over the course of several hours. The trial court could have reasonably concluded that the similarity of the other two instances of domestic violence compellingly demonstrated that Anders was not

17

fabricating her claims against Redin. *See James*, 623 S.W.3d at 548 ("[E]vidence of prior assaults and abuse makes it less likely that a complainant has fabricated the charged offenses."). Redin argues that the extraneous-offense evidence was not particularly probative of whether he strangled Anders, but, as detailed above, because Redin placed Anders's credibility into question, it was reasonable for the trial court to conclude that that evidence was probative on the issue of the truthfulness of Anders's claims and that the probative value of the extraneous-offense evidence was strong.

Redin also urges that the State did not need the extraneous-offense evidence because it had Anders's direct evidence and her mother's corroborative testimony, but we disagree. Redin called Anders's credibility into question, and Anders's mother's testimony was largely circumstantial.[3] Anders's testimony was the only direct evidence of what was actually happening when Redin was assaulting her. The State had a need for evidence to counteract Redin's defense regarding Anders's fabrication of his assaults on her.

Redin argues that the inflammatory nature of the extraneous domestic-violence evidence tends to suggest that the jury made a decision on an improper basis. Again, we disagree. The evidence of Redin's assaults on J.C. and M.C. was no more inflammatory than the charged

---

[3]Anders's mother, Kimberly Jones, testified that, on the night preceding Redin's arrest, she was concerned for Anders because Anders's father had not heard from Anders. Jones went to Anders's apartment. As Jones approached Anders's apartment, she testified she could hear a commotion, "lots of tumbling noises . . . and . . . shouting." Jones said she knocked on the door, and Anders answered, with Redin behind her. She stated that Redin pulled Anders back and slammed the door. She said the door soon opened again, and Anders was "flung across the hallway." She stated Anders motioned to her to leave. Jones said she could hear Redin yelling, and Anders went back into the apartment. Jones called 9-1-1 and waited in her car in the parking lot for the police to arrive. Jones said she could see Anders's apartment from where she was parked, and Anders came out onto the balcony. Jones stated she asked Anders whether she was okay and Anders said no. Jones testified that she asked Anders whether she needed help and Anders said yes. After Jones called 9-1-1 a second time, she said she continued to wait in the parking lot until the police arrived.

18

offense. *See, e.g.*, *Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996) (observing that "the first murder, being no more heinous than the second, was not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose"). Further, when the trial court admitted the evidence, it stated that it would include a limiting instruction in the jury charge, and it did so. We presume the jury obeyed the trial court's instruction. *See Roe v. State*, 660 S.W.3d 775, 785 (Tex. App.—Eastland 2023, pet. ref'd).

J.C.'s and M.C.'s testimony was straightforward and easy to understand, and the evidence was relevant to the question of whether Redin had committed the charged offense, which was the only issue in this case. And because the evidence "concerned matters easily comprehensible by laypeople," *Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd), it was unlikely to be given undue weight. It was reasonable for the trial court to determine that those factors weighed in favor of admissibility of the extraneous-offense evidence.

The extraneous-offense witnesses were two of nine witnesses presented by the State, and they each testified exclusively to their assault by Redin. The trial court held a hearing on the extraneous-offense evidence outside the presence of the jury. That hearing, in which the State presented both witnesses and all photographs, and Redin presented his objections to the photographs, was completed in an hour and thirty-five minutes. In ruling on the admissibility of the extraneous-offense evidence after Anders's testimony, but before the extraneous-offense witnesses were presented, the trial court reasonably determined that the presentation of that

19

evidence during the three-day trial would not consume an inordinate amount of time, repeat evidence already admitted, or constitute a significant "distract[ion] from consideration of the indicted offense." *See Mozon*, 991 S.W.2d at 847 (quoting *Santellan*, 939 S.W.2d at 169 (citing *Montgomery*, 810 S.W.2d at 389–90)).

We conclude that the trial court's ruling was, at a minimum, within the "zone of reasonable disagreement" which is protected from appellate reversal by the abuse of discretion standard of review. *See Irsan*, 708 S.W.3d at 616 (quoting *De La Paz*, 279 S.W.3d at 344). Redin has failed to show that the extraneous-offense evidence's high probative value was substantially outweighed by unfair prejudice. *See Hampton*, 2025 WL 2423516, at *4; *James*, 623 S.W.3d at 547. "Because the extraneous offense was similar in nature and seriousness to the charged offense, the extraneous-offense evidence was not unfairly prejudicial." *Hampton*, 2025 WL 2423516, at *4. We find that the trial court could reasonably conclude that the probative value of the extraneous-offense evidence was not substantially outweighed by the danger of unfair prejudice. Because the trial court did not abuse its discretion by admitting this evidence, we overrule Redin's first two points of error.

## III. Mistrial

In his third and fourth points of error, Redin urges the trial court erred in denying his motions for mistrial made in two separate instances when Anders and one of the investigating officers referenced Anders's statement during her interview about the domestic-violence charges against Redin in California.

"A trial court's denial of a mistrial is reviewed under an abuse of discretion standard." *Hallman v. State*, 721 S.W.3d 307, 313 (Tex. Crim. App. 2025) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). "A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* (quoting *Ladd*, 3 S.W.3d, at 567). Here, too, a trial court's decision will stand unless "the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id.* (quoting *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009)). Further, abuse of discretion review of mistrial decisions is subject to harmless error analysis. *Id.* at 312–13, 324.

Because there was no abuse of discretion in admitting the extraneous-offense evidence, we find no abuse of discretion regarding the trial court's mistrial decisions. Redin complains of brief witness testimony to the effect that Redin was facing pending charges in California. The extraneous-offense witnesses were the complainants in those charges. They testified independently to those charges. The comparatively extensive testimony of those witnesses rendered any harm from the earlier passing references harmless. *See id.*

We overrule Redin's third and fourth points of error.

21

## IV.     Conclusion

We affirm the judgment of the trial court.

Jeff Rambin
Justice

Date Submitted:     September 11, 2025
Date Decided:       March 30, 2026

Do Not Publish